1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8
9

SWIPEJOBS, INC., a Delaware Corporation,

Plaintiff,

10

v.

11

TRUEBLUE, INC., a Washington Corporation,

12

Defendant.

13

NO.  2:25-cv-01545

**COMPLAINT**

**\*\*REDACTED\*\***

14      Plaintiff Swipejobs, Inc. ("Plaintiff" or "Swipejobs"), by its undersigned counsel, hereby

15 alleges for its Complaint against Defendant TrueBlue, Inc. ("Defendant," "TrueBlue," or "TBI"),

16 as follows:

17                    **PRELIMINARY STATEMENT**

18      1.      This case is about TrueBlue infringing the trade secrets and confidential

19 information of Swipejobs to build its own digital platform and blatantly filing patents on

20 Swipejobs' trade secrets and confidential information. The situation detailed below goes a long

21 way to explain why TrueBlue's stock-price graph over the past few years looks like this:

22
23
24
25
26



27

COMPLAINT - 1
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Before the time this graph starts, TrueBlue leadership had decided to develop its own digital platform to run its staffing business, PeopleReady, with the goal of terminating its partnership with Swipejobs, which it had the contractual right to do. After TrueBlue went out of its way to deceive Swipejobs, Swipejobs gave TrueBlue many opportunities to work collaboratively to ensure that TrueBlue would not misappropriate Swipejobs' trade secrets or confidential information when building its platform. This would have protected both parties. TrueBlue declined and explained it "would have to go out of [its] way to infringe" and "non-infringement is fairly easy." TrueBlue also believed building its own platform would be easy. At the time, TBI said it could build its own system for a minimal investment of $5 million and that it would cost only $1 million a year to maintain. Instead, TBI has spent the past more than five years burning through cash building its new platform. TBI has referred to spending well over $70 million on these efforts and one of TBI's key executives responsible for this platform refers to it as a $100 million app in his LinkedIn profile.

2.    Worse, TBI failed to even develop its own solution despite this expense. Instead, TBI turned to stealing Swipejobs' trade secrets, confidential information, and technical know-how. This deliberate decision—made by TBI Executives—to engage in shameless breach of contract and misappropriation of Swipejobs' trade secrets has profoundly harmed Swipejobs.

3.    TrueBlue had extensive access to Swipejobs' trade secrets, confidential information, and know-how and used it to build its own platform. As Swipejobs continued to rapidly develop and update its platform, TrueBlue requested detailed specifications of and presentations on the new functionality. The new functionality was available to TrueBlue at no additional cost and would have added significant value to TrueBlue and its shareholders. While TrueBlue requested detailed information around these specific features and functionality, it chose not to switch them on for years. When asked why TrueBlue did not take Swipejobs' platform updates, TrueBlue's response was "so our platform doesn't look bad in comparison."

4.    When Swipejobs proactively approached TBI and offered to help ensure that TBI's development of its own solution complied with the parties' agreement (which TBI

COMPLAINT - 2
NO. 2:25-cv-01545

declined), TBI claimed that it was taking a "clean room" approach to development—allegedly isolating anyone with access to Swipejobs' trade secrets, confidential information, and technical know-how from involvement in TBI's solution. Again, Swipejobs later learned this was false. Indeed, the very individuals who had complete access to Swipejobs' confidential information and know-how under the parties' agreement were not only designing TBI's technology, but also filing multiple patent applications on Swipejobs' confidential information and trade secrets. In doing so, TBI falsely claimed to be inventors of Swipejobs' technology—listing its employees as so-called "inventors"—in addition to publishing Swipejobs' trade secrets to the world and assigning these stolen patent rights to TBI. These actions constitute both breach of contract and trade secret misappropriation. Also, as the agreement at issue in this case makes clear, the proper owner of those patent rights—and the features themselves—is Swipejobs, not TBI. As such, TBI's multi-million-dollar spend on "its own" platform development was unlawful and cannot be regarded as a bona fide capital investment, as it has claimed for years. Until this matter is resolved, the TBI Board would be making the decision to keep investing in its solution knowing that any further investment—including any construction in progress costs— may later be deemed unlawful and stripped of value, materially undermining profitability.

5.    In addition to filing patent applications based on inventions conceived of by Swipejobs, TBI also wrongfully incorporated Swipejobs' trade secrets, confidential information, and know-how into its supposedly new platform. This explains how TrueBlue was able to launch its platform with the same know-how, structure, and combination of proprietary features in half the time it took Swipejobs as the inventor that had been iterating and continuously improving the Swipejobs Exchange by releasing new software at a rapid pace.

6.    It also explains why, when compared to the other technical solutions in the staffing industry, the supposedly "new" TBI solution is the most directly comparable solution to the Swipejobs Exchange in the market.

7.    Swipejobs had no reason to suspect that TrueBlue was covertly misusing Swipejobs' trade secrets to build its own platform given TrueBlue's express and unequivocal

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

agreement to protect Swipejobs' confidential information.  In addition, TBI's current President and CEO and then-President of PeopleReady, Taryn Owen, said repeatedly she was skeptical of TBI's ability to build its own solution.  Ms. Owen told Swipejobs that she had no role in the decision to build a TBI platform, that she did not agree with the decision, and that she had no confidence in TBI—which is not a software company—to build the platform.

8.    Swipejobs has since learned that Ms. Owen's representations to Swipejobs were duplicitous.  Ms. Owen had in fact tied both her reputation and compensation to the launch of TBI's platform. This would explain why prior to learning of TrueBlue's breach, and as TrueBlue started to roll out its new platform, Swipejobs provided data to show that the new TrueBlue platform caused revenue (worked hours) to decline and client users to leave rapidly. These data were sent to TrueBlue executives and the response was consistent—that TrueBlue "wasn't seeing it" in the data even though Swipejobs pointed out both parties were analyzing the same TrueBlue data.

9.    The "new" TBI solution, referred to in this Complaint as "JobStack 2," is illegal and built in flagrant violation of Swipejobs' rights.  After uncovering this violation in 2024, Swipejobs approached TBI to reach an amicable resolution.  Unfortunately, Swipejobs' good faith efforts to resolve this matter amicably over more than twelve months with TBI Executives and the TBI Board have failed, without explanation from TBI about why it chose to ignore the contract and steal Swipejobs' trade secrets.  The situation is untenable for TBI to have patents illegally obtained on Swipejobs' very own innovations.  Swipejobs has been forced to file this case seeking enforcement of its rights and associated judicial remedies as set forth below, including an injunction to shut down TBI's theft and a declaration that Swipejobs owns TBI's patent filings that disclose features of the Swipejobs Exchange, as well as the features themselves.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

**PARTIES**

10.     Plaintiff Swipejobs is incorporated under the laws of Delaware, with its principal place of business at Dallas, Texas.

11.     Defendant TrueBlue is incorporated under the laws of Washington, with its principal place of business at Tacoma, Washington.

**JURISDICTION AND VENUE**

12.     This civil action seeks damages, injunctive relief, and other equitable relief under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 *et seq.* ("DTSA"); the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 256; Delaware and Washington state law including the Washington Uniform Trade Secrets Act, RCW 19.108.010, *et seq.*; and the Declaratory Judgment Act, 28 U.S.C. § 2201–02.

13.     This Court has original subject matter jurisdiction over this case because it presents claims arising under federal trade secret law and federal patent law, as well as under the Declaratory Judgment Act.  28 U.S.C. §§ 1331, 1338; 18 U.S.C. § 1836(c); 28 U.S.C. §§ 2201–02.  This Court has supplemental jurisdiction over the other claims presented herein because they form part of the same case or controversy.  28 U.S.C. § 1367(a).

14.     This Court also has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because (i) there is complete diversity amongst the parties, as Swipejobs is a resident of Delaware and TBI is a resident of Washington, and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over TrueBlue because Washington is TrueBlue's state of incorporation and the state in which TrueBlue maintains its principal place of business.

16.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) because TrueBlue resides and is subject to personal jurisdiction with respect to this action in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this judicial

**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

district.  TrueBlue has also consented in writing to venue in this District for any action between the parties arising out of or related to the Exchange Agreement at issue in this case.

## FACTUAL BACKGROUND

### A.    The Swipejobs Exchange and Related Trade Secrets

17.    Swipejobs is the creator of the Swipejobs Exchange (the "Exchange"), a live transaction platform that seamlessly connects its customers (employers) to temporary workers and job seekers, known as "associates," in real time.

18.    The Exchange revolutionized the temporary staffing industry.  Prior to the release of the Swipejobs Exchange, the process of connecting employers to temporary workers was riddled with inefficiencies and conducted by personnel in branch office hours.  In some instances, staffing agencies or "recruiters" reduced this process to physical paper—a labor-intensive and ineffective solution that took an inordinate amount of time and required significant manual intervention from personnel.

19.    The Exchange allows its customers to transact with associates in real time. Customers seeking temporary workers use the Exchange to order, reorder, extend, rate, and invite workers with ease.  The Exchange is designed to provide temporary workers with job matches that they can take 24/7, rather than having to wait for personnel to reach out to the temporary worker to offer a job.

20.    In the Exchange, one action instantly adjusts all aspects of the system.  Customers seeking temporary labor and associates seeking temporary work each see a unique user interface of the Exchange that is updated based on every other action already taken within the Exchange. For example, if another worker fills a position, it is instantly removed from the Exchange to prevent double-booking.  This automatic model ensures efficiency and accuracy and obviates the need for manually handling this process.  Meanwhile, the staffing firm has visibility and the ability to act through a third interface called the Service Desktop.

21.    The Exchange was difficult to build and took a dedicated team of experts over six years to develop its unique combination of features and functionality.  This included Swipejobs

COMPLAINT - 6
NO. 2:25-cv-01545

engaging professors who specialize in job data models to assist with key predictive features of the Exchange.  Swipejobs has continuously updated the Exchange over the last eleven years—including when TBI began breaching the Exchange Agreement—and continues to do so today.

22.    Staffing firms have long attempted to build their own digital platforms to transform their staffing businesses.  Until the Exchange, no staffing company had built a solution that operated independently of traditional, rudimentary staffing technology systems.  Many competing platforms were not fully automated and still required recruiters to perform manual steps in business hours to fill jobs.  Some platform providers struggled to scale their platforms because they used traditional technology architectures rather than an asynchronous system like the Swipejobs Exchange and JobStack 2.  Swipejobs addressed all these issues and more through its development of the Exchange.

23.    As staffing firms have tried and failed to build anything like the Exchange, Swipejobs' solution quickly caught the attention of major players in the industry.

24.    As one line of business, Swipejobs "white labels" the Exchange to staffing firm partners so they may serve their own employers, or "customers," and temporary workers, or "associates," on a branded platform.

25.    Swipejobs provides its white label partners with consulting services where the partner may request customization and configuration for its particular staffing firm.  This includes the maintenance and ongoing development and innovation of the Exchange.

26.    TrueBlue was interested in digital transformation and had attempted a digital solution called WorkAlert that personnel used to send text messages to workers' phones instead of calling them.  The solution was not working, which led TrueBlue to Swipejobs' more comprehensive digital solution.

27.    In early 2015, Swipejobs completed a successful pilot of the Exchange with TrueBlue.  The parties signed a contract in late 2015.  From launch to present day, Swipejobs has continuously innovated and updated the Exchange and its features.  Swipejobs' customers enjoy regular releases that expand upon the current functionality of the Exchange and integrate entirely

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

new features.  As an example of this continuous deployment environment, Swipejobs released over 4,700 updates in 2024 alone.  This continued commitment to innovating the Exchange has solidified Swipejobs' position at the forefront of digital platforms in the staffing industry.

28.    With over eleven years of investment and innovation updates, far out pacing anyone in the industry, it is no coincidence that the TrueBlue platform—which has been stolen from Swipejobs—is the only directly comparable solution to the Swipejobs Exchange.

29.    The importance of Swipejobs' proprietary information, including intellectual property, confidential information, trade secrets, know-how, and other intangible assets, cannot be overstated.  Put simply, Swipejobs derives most of its value from its unique platform.  As a result, Swipejobs goes to great lengths to safeguard its intangible property, particularly when contracting with third parties.

30.    Swipejobs owns several trade secrets covering key features embodied in the Exchange, as detailed in Paragraphs 31–37 below (collectively, the "SJ Trade Secrets").

31.    **Service Desktop:** The backend interface of the Exchange, known as the "Service Desktop," is a window into Swipejobs' know-how embodied in the Exchange.  The Service Desktop is a platform that allows personnel of a Swipejobs staffing partner, such as TrueBlue, to view the digital transactions occurring in the platform in real-time.  Through this process, the Service Desktop reveals most of the know-how of the Exchange.  The Service Desktop provides a Swipejobs staffing partner visibility into how the Exchange operates and allows them to manage the digital staffing process.  It includes all digital information for the customers and workers and the workflows of actions that are taken automatically, providing real time transparency into Exchange transactions.  This includes the backend organization, structure, arrangement, and presentation of the relevant information.  The Service Desktop is visible only to Swipejobs and the personnel of its staffing partners who use the Exchange and who have an express duty to maintain the confidentiality of the information and functionality contained in the Service Desktop.  Swipejobs owns trade secrets in the Service Desktop, including those

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

described below, and in the combination of the features that make up the Service Desktop functionality.

32.     **Priority Actions on Service Desktop:** In a traditional staffing model, internal personnel (recruiters) would manually perform all steps in the staffing process and enter the actions they took into a system—for example, creating a new customer order for workers, extending a job to a worker, inviting a worker to apply for a job, checking the hours a worker worked, billing the customer for the hours worked, and rating a worker.  The Exchange transformed this time-consuming and human error-prone process by automating many steps and allowing customers and workers to transact in real time without involving the recruiter.  Given the automatic nature of many of the Swipejobs Exchange's features and functions, a critical component of the Exchange is the method through which staffing partners' personnel are alerted if customers or associates take actions themselves in the real time Exchange that require manual intervention from staffing partner personnel.  The personnel are alerted of the issue and given the steps to address the issue, including in what order and why.  These "Priority Actions" provide visibility into the inner workings of the Exchange.  This is hereinafter referred to as the "Priority Actions Trade Secret."

33.     **Customer Invitation on Service Desktop:** Swipejobs owns trade secrets in the method for automatically inviting customer contacts onto the Exchange and assigning them customized permissions and access, including the organizational structure and arrangement of the customer information in the Exchange (e.g., by city, job site, etc.) and specific workflows.  These trade secrets are hereinafter referred to as the "Customer Invitation Trade Secret."

34.     **Matching Information on Service Desktop:** Swipejobs owns trade secrets in the method of automatically determining whether a worker matches the requirements for a job order in the Service Desktop.  These trade secrets, which include the real-time reactions and screen displays in the Service Desktop, are hereinafter referred to as the "Matching Information on Service Desktop Trade Secret."

COMPLAINT - 9
NO. 2:25-cv-01545

**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

35.    **Conditional Dispatch:** Swipejobs owns trade secrets in the processes, detailed flowcharts, and know-how necessary to automate the management of matching workers with jobs that require additional requirements, including additional skills, licenses, or administrative requirements (such as a background or drug test). These include changes made to the Exchange's matching algorithms and the Service Desktop to allow workers matching some, but not all, requirements for a job to indicate interest, be automatically alerted of the additional requirements they must fulfill, and be provided with the opportunity to fulfill these additional requirements and take the job. This trade secret is hereinafter referred to as the "Conditional Dispatch Trade Secret."

36.    **Rates Engine:** Swipejobs owns trade secrets in the methods and logic used to generate and assign bill rates for client orders. These trade secrets are hereinafter referred to as the "Rates Engine Trade Secret."

37.    **Reliability Service:** Swipejobs owns trade secrets in the algorithms for determining worker reliability based on previous work history. This is hereinafter referred to as the "Reliability Service Trade Secret."

38.    In addition to the SJ Trade Secrets, Swipejobs developed a combination of proprietary features that enhanced the performance and user experience of the Exchange. These features introduced advanced functionality that distinguished the Exchange as a best-in-class platform, unmatched by competitors in the market. The combination of these features together with those in the Service Desktop above are also protected by Swipejobs as trade secrets. These include:

39.    **Proprietary Exchange Features:** The Exchange includes the combination of many proprietary features for matching temporary workers and customers for staffing and accepting jobs in real time, including the workflows and specific real-time reactions created in response to certain actions by a temporary worker.

40.    **Proprietary Geolocation Feature:** Another proprietary feature is a geolocation feature that detects whether a worker is at an assigned worksite when starting a job. Among

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

other things, the geolocation feature includes an escalation protocol if the worker is not at the assigned worksite when starting a job. This concept is hereinafter referred to as the "Proprietary Geolocation Feature."

41. **Proprietary Probability of Fill Feature:** Yet another proprietary feature is a model that calculates key probabilities providing data-driven insights to customers. One such probability is the probability that a customer's order is dispatched or filled by a worker. This concept is hereinafter referred to as the "Proprietary Probability of Fill Feature."

42. Swipejobs' key, novel features, including their combination, detailed above set the Exchange apart from competing solutions. Under the Exchange Agreement, each of these features and their underlying intellectual property belong solely to Swipejobs.

## B. TrueBlue Wanted a Digital Platform but Its Work Alert Solution Was Insufficient

43. TrueBlue is a publicly traded staffing, recruiting, and workforce management company. As of early 2015, TrueBlue was less mobile-enabled than its competitors, despite acquiring a mobile solution called Work Alert for LaborReady (now "PeopleReady"), its on-demand labor brand. Work Alert primarily sent Short Message Service (SMS), or text messages, to offer jobs to workers. This system presented many inefficiencies that resulted in low response rates: workers were inundated with text messages for competing assignments, the number of messages sent depleted workers' text message allowance, the system required significant manual intervention from users, and the system did not account for logistical challenges such as changing cell phone numbers.

44. The Exchange was attractive to TrueBlue because it was unique. TrueBlue, like other staffing firms, could not successfully build a platform like the Exchange that would permit real-time transactions and significantly simplify and accelerate temporary staffing.

45. Seeing an opportunity to both assist TrueBlue with its mobile transformation and test its own platform, Swipejobs offered to conduct a pilot of the Exchange for TrueBlue in early 2015. Swipejobs conducted this pilot at no cost. The Exchange pilot concluded in April 2015

COMPLAINT - 11
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

and was so successful that it resulted in Swipejobs presenting its technology to TrueBlue's Executive leadership.  TrueBlue's then-CEO took the Swipejobs proposal to the Board of Directors and the parties negotiated a long-term deal for Swipejobs to provide TrueBlue with a branded version of the Exchange (hereinafter, "JobStack").

**C.     The Exchange Agreement and Amendment Agreements**

46.     Following the completion of the Exchange pilot, Swipejobs and TrueBlue entered into a confidential agreement with an effective date of November 12, 2015 (the "Exchange Agreement").  Under the Exchange Agreement, Swipejobs committed to provide a branded version of the Exchange to TrueBlue along with related consulting services.  The Exchange Agreement also contained critical provisions restricting TrueBlue's ability to modify, copy, or discover proprietary information about the Exchange, among other things.

47.     The Exchange Agreement remains in force and effect as of the filing date of this Complaint, though the parties have mutually amended portions of the agreement multiple times.

48.     ████████████████████████████████████████████ ████████████████████████████████ Exchange Agreement, § 16.8.

49.     Section 2.3 of the Exchange Agreement states that ███████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████ Swipejobs carefully and deliberately negotiated this term with TrueBlue, and it was integral to Swipejobs' entry into and continuation of the relationship. Notably, this provision remains unchanged despite the parties' eight executed amendments.

50.     The Exchange Agreement also includes a provision limiting the extent to which the parties could use the "Confidential Information" of the other party received pursuant to the Exchange Agreement.  Specifically, Section 5.2 of the Exchange Agreement limits a party's right to use the other's Confidential Information ████████████████████████████ ██████████████████████████████

COMPLAINT - 12
NO. 2:25-cv-01545

51.    Under the Exchange Agreement, "Confidential Information" means ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████    Exchange Agreement, § 5.1.  The provision on "Confidential Information"

specifically defines Swipejobs' "Confidential Information" as including, without limitation,

███████████████████████████████████████████████████████

52.    None of the party's eight amendments to the Exchange Agreement alter the

provisions governing "Confidential Information."  These provisions were integral to the parties'

relationship and specifically and carefully negotiated for that reason.

53.    The parties also took steps to clarify the ownership of any features, elements, or

proprietary information born from the parties' collaborative partnership.  Section 6.2 of the

Exchange Agreement states that:

███████████████████████████████████████████████

54.    Section 6.2 of the Exchange Agreement unequivocally grants to Swipejobs ███

█████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

55.     The parties never revised the ownership and feedback-related provisions in any of the eight amendments to the Exchange Agreement.

56.     Swipejobs negotiated for each of these provisions to protect its rights, including its proprietary interests in its ideas, non-public information, intellectual property, Confidential Information, and know-how (collectively, the "Proprietary Information") if and when TrueBlue opted to develop its own competing solution.  Each of these provisions were prerequisites to Swipejobs' entry into and continuation of the Exchange Agreement.  Because Swipejobs' value as a company lies in its intangible assets and Proprietary Information, including its Exchange solution and the unique functionality and features contained therein, it would not share Confidential Information with TrueBlue or otherwise perform its obligations under this contract absent these provisions.

57.     The original Exchange Agreement contains a provision specifically addressing TrueBlue developing its own competing solution: ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████

58.     The parties reiterated TrueBlue's right to ████████████████ in amendments to the Exchange Agreement executed on July 19, 2018 ("Amendment Agreement No. 4") and December 20, 2019 ("Amendment Agreement No. 5").  All these Amendments reinforced that, while TBI had the right to █████████████, that right was conditioned upon █████████ ██████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████

59.     Paragraph 4.1.4 of Amendment Agreement No. 4 states: ████████████████████████████████████████████

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1
2
3
4



5
6

60.     Similarly, Paragraph 8.1 of Amendment Agreement No. 5 states:



7
8
9
10
11
12
13
14
15
16
17

61.     The parties extended the term stipulated in Section 8.1 of the Exchange

18

Agreement in the subsequent Amendment Agreement Nos. 6 and 7, executed December 30,

19

2021, and December 19, 2022.  Pursuant to Amendment Agreement No. 7, the Exchange

20

Agreement is valid through December 31, 2025.

21

62.     TrueBlue's contractual right to develop its own competitive solution is, and

22

always has been, ████████████████████████████████████████████

23

████████████████████████████████████████  Absent such a

24

limitation on TrueBlue's rights, Swipejobs would not have entered into the Exchange Agreement

25

in the first place.

26
27

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

63.     Despite the clear terms of the Exchange Agreement, TBI built its own platform in violation of the Exchange Agreement.

64.     From the first discussion with TrueBlue in 2015, Swipejobs has emphasized the importance of its rights, including Swipejobs' rights in its Proprietary Information, at every material meeting between the parties.  This emphasis on its rights under intellectual property law and the contract are precisely why the related provisions in the Exchange Agreement are so detailed and are reinforced in all relevant amendments that raise TBI building its own platform.  TrueBlue has always accepted Swipejobs' terms related to the protection of its rights and proprietary interests and agreed to their inclusion in all amendments to the Exchange Agreement.

65.     The parties anticipated that disputes might arise under the Exchange Agreement and set forth ███████████████ in Section 16.9 of the Exchange Agreement, which includes ████████████████████████████████████████████ These procedures have been complied with, but no resolution was obtained.

66.     Implicit in every contract governed by Delaware law is a covenant of good faith and fair dealing.  The implied covenant requires that the parties to the contract act in good faith and deal fairly with one another in the performance and enforcement of the contract.  It is used to infer contract terms to handle unanticipated developments or contractual gaps.

67.     Although Section 4.1 (and related amendments thereto) permits TrueBlue to develop a "████████████████████████████████████████ ███████████████████████████████████ ████████████████████████████████ the contract does not specify *how* the parties would ensure that TrueBlue's ███████████████ in compliance with the Exchange Agreement.  Confirming that TrueBlue was following basic industry approaches to avoid breaching the agreement, such as using a clean room approach, was essential given the sheer amount of Proprietary Information Swipejobs shared with TrueBlue over the years and ████████████████████████████████ ████████████████ in Section 6.2.  These provisions, and TrueBlue using basic and minimum

mechanisms, were critical as TrueBlue decided to build its own platform. It is clear TrueBlue did not even attempt to comply with the Exchange Agreement.

68.     After TrueBlue deliberately misled Swipejobs for 12 months about building its own platform, TrueBlue ignored multiple offers from Swipejobs to collaborate to ensure it did not breach the Exchange Agreement. Swipejobs could not understand why TrueBlue did not want to collaborate when this would ensure it did not breach the Exchange Agreement. It is now clear that TrueBlue did not want to collaborate because it had no intention of complying with the Exchange Agreement, starting with a complete lack of a "clean room" approach to development. TrueBlue instead involved the executives who had complete knowledge of and access to the Exchange in building the TrueBlue platform and filing patents on Swipejobs' Trade Secrets. In fact, those same executives are listed as inventors on those patent filings.

69.     The recital in the Exchange Agreement that states ████████████████ ███████████████████████████████████████████████████ ███ (emphasis added), together with Sections 2.3 (prohibiting ██████████████), 4.1 (permitting TrueBlue to develop ████████████████ mobile solution), 5.2 (████████████████████████), and 16.9 (███████████ procedure) of the Exchange Agreement, create and give rise to an obligation for TrueBlue to be forthcoming with Swipejobs about ████████████████ and to work in good faith with Swipejobs to ensure that TrueBlue was not ████████████████████████ ████████████████████████████████████████ ████████████████████

70.     Section 9.1 and Exhibit C of the Exchange Agreement indicate that Swipejobs will provide TrueBlue with ████████████████████████████ █████████████████████████████████████████ ███████████████████████████████████ ████████████████████ While these terms require Swipejobs to provide these

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1  services to TrueBlue, nothing suggests they may be requested or must be provided to further

2  TrueBlue's development of its own, independent solution separate and apart from the Exchange.

3      71.    When read together with the Exchange Agreement recitals and Sections 2.3

4  (prohibiting ████████████) and 5.2 (███████████████████████████████

5  ██████████), Section 9.1 and Exhibit C create an implied obligation of TrueBlue to ██

6  ████████████████████████████████████████████████████████████████

7  ██████████████████████████████████

8      72.    Swipejobs has performed its obligations under the Exchange Agreement and its

9  amendments.

10     73.    With respect to each of the claims of breach detailed herein, Swipejobs raised its

11  concerns via notice letters in compliance with Section 16.9.  Following the exchange of notice

12  letters, the parties submitted to non-binding mediation ████████████████████████

13  ██████████    In a final effort to resolve the issue, Swipejobs sent a letter to the TrueBlue Board,

14  but did not receive a response.  After mediation efforts failed, Swipejobs was forced to file the

15  instant Complaint to protect its rights.

16     **D.    Swipejobs' Investment in and Protection of its Intellectual Property**

17     74.    Swipejobs took measures to protect its rights and interests in its Proprietary

18  Information.  Swipejobs strategically pursued patent protection for certain features of its

19  Exchange solution, while deliberately preserving other aspects as confidential and trade secret

20  due to their commercial sensitivity and competitive value.

21     75.    Swipejobs invested significant effort, money, and resources in the protection and

22  development of its Proprietary Information.

23         **1.    Patent Protection**

24     76.    As early as 2013, Swipejobs made substantial investments in protecting its

25  innovative technologies through its patent strategy.  This investment resulted in numerous U.S.

26  and foreign patent applications, several issued U.S. patents, and multiple foreign patents

27  (collectively "SJ's Patent Filings").

COMPLAINT - 18
NO. 2:25-cv-01545

77.    SJ's Patent Filings include:

- U.S. Patent No. 10,706,389 (the '389 Patent), which has a priority date of October 11, 2013;

- U.S. Patent No. 12,093,898, which also has a priority date of October 11, 2013;

- U.S. Patent No. 10,586,212 (the '212 Patent), which has a priority date of April 28, 2015; and

- U.S. Pat. App. No. 16/598,348 (the '348 Application), which has a priority date of October 12, 2018.

78.    SJ's Patent Filings were filed to protect certain aspects of Swipejobs' innovations. For example, Swipejobs filed the '348 Application to protect its Proprietary Probability of Fill Feature.

79.    Swipejobs' lead innovator and founder, Katrina Leslie, is the named inventor on SJ's Patent Filings.  Leslie's pioneering work forms the foundation of Swipejobs' technological advancements and intellectual property portfolio.

80.    Swipejobs continues to invest in patent protection for its innovations.

**2.    Trade Secrets**

81.    Swipejobs opted to preserve key aspects of the Exchange as trade secrets rather than disclosing them in its patent applications.

82.    As described above, the SJ Trade Secrets comprise key aspects of the Swipejobs Exchange that distinguish its combination of functionality from that of every competitor on the market.

83.    The SJ Trade Secrets are highly confidential and maintained by Swipejobs in strict confidence to protect their value and the substantial investments Swipejobs made to develop them.

84.    Swipejobs derives independent economic value and gains a continued competitive advantage from the secrecy of the SJ Trade Secrets.  It earns revenue from licensing the

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Exchange, which embodies the SJ Trade Secrets, to third-party staffing firms and using the SJ

Trade Secrets to update and maintain the Exchange for its clients.

85.     Swipejobs negotiated a broad clause governing TrueBlue's ability to receive or

disclose Swipejobs' Confidential Information, including information regarding the SJ Trade

Secrets.  Specifically, the Exchange Agreement prohibits TrueBlue ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████   Swipejobs required TrueBlue's assent to this clause before it

provided TrueBlue with access to any SJ Trade Secrets.

86.     Swipejobs restricts access to the SJ Trade Secrets to its own employees and

representatives and the recruiting firms that license the Exchange from Swipejobs.  All of

Swipejobs' partners, employees, and representatives are required to agree to strict confidentiality

provisions that do not permit the further disclosure of Swipejobs' Confidential Information to

others before they are given access to the SJ Trade Secrets.

87.     Swipejobs' employee policies require that upon termination of employment,

employees must cease using and may not retain any Swipejobs property whatsoever, including

intellectual property and Confidential Information.

88.     Swipejobs does not disclose any of the SJ Trade Secrets in any of its marketing

materials.  It does not disclose the SJ Trade Secrets in pitches to prospective clients unless the

prospective client has first signed a non-disclosure agreement.

89.     The computer systems that store the SJ Trade Secrets, including access to the

Service Desktop, are password protected.

90.     Swipejobs uses encrypted methods of communication, including encrypted email,

to discuss trade secret information and never discloses the SJ Trade Secrets on platforms that are

not secure or are vulnerable to public access.

91.     Accordingly, the SJ Trade Secrets are not publicly known, nor are they generally

known within any relevant industry.  Swipejobs is the only company to successfully build a

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

solution that is structured, works like, and contains the unique combination of features embodied within the Exchange.

92.     Without access to both Swipejobs' backend Service Desktop (which is strictly controlled) and extensive documentation and demos of Swipejobs' know-how, structure, and confidential information, the SJ Trade Secrets are not susceptible to reverse engineering or independent discovery, and it would be exceptionally difficult at the least, and perhaps impossible, for others, including the customers and workers on the Exchange, to acquire or duplicate the SJ Trade Secrets through proper means.

### E.     TrueBlue Routinely Took Advantage of Swipejobs

93.     Swipejobs and TrueBlue have approached their business relationship and corresponding obligations under the Exchange Agreement in dramatically different ways. Swipejobs has gone above and beyond to cater to TrueBlue's needs and build a fruitful relationship between the companies.  TrueBlue, on the other hand, has demonstrated an unwarranted sense of entitlement to Swipejobs' assets and property.

### 1.     The Turning Point with TrueBlue Based on Fees & Due to the Belief the Platform Was Easy to Build and Low Cost to Maintain

94.     TrueBlue refused to honor the fee structure agreed to in the original Exchange Agreement.  Under the 2015 contract, Swipejobs agreed to perform under the contract in exchange for ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████ Exchange Agreement, § 7.1, Exhibit D ("Fees").

95.     The purpose of this ████████████████████ was to better reflect TrueBlue's actual use of the Exchange solution linked to actual user numbers and the associated consulting efforts Swipejobs provided in connection with maintaining and improving the solution.  The parties understood and contracted for TrueBlue to eventually pay Swipejobs in accord with the size and scope of the Exchange solution.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

96.     Despite this agreement, TrueBlue significantly resisted the shift to a ████████ ████████████████████ In conversations around fees, TBI's reasoning centered around the belief that the platform was not hard to build and would not cost much to maintain. TBI believed it would take approximately $5 million to build the platform and $1 million a year to maintain. This seems to be the primary reason TrueBlue insisted on ████████████ that covered complete use of the Exchange, unlimited users, and unlimited consulting services, regardless of how much of the platform was used or the amount of consulting services rendered for TBI to customize at its request.  TrueBlue always insisted on viewing all pricing negotiations as a percentage increase year-over-year even if it meant exponentially more users over time.

97.     This came to a head in September 2019, and in hindsight seems to be the turning point, when Swipejobs' founder, Katrina Leslie, met with the then-CEO of TrueBlue, Patrick Beharelle, to discuss fees.  Fees were already a source of tension between the parties and now TrueBlue was requesting to add digital onboarding to the Exchange, which would significantly increase the number of users on the platform (which was already at 518,000 users).  Swipejobs spent more than a year building digital onboarding as a major component of the platform.

98.     Leslie communicated this to Beharelle, noting that investors had commented that Swipejobs' current arrangement with TBI, where TBI paid a flat fee for unlimited users and unlimited consulting services, was an unreasonable deal for Swipejobs.  She further told Beharelle that Swipejobs needed to be paid fairly for the use of the platform relative to the number of users and that the parties needed a reasonable cap on the consulting services. Beharelle reacted poorly to any discussion around fees, and commented that having investors was adding instability to the partnership.

99.     Based on the subsequent negotiations and the settling of fees, it was reasonable for Swipejobs to expect that TrueBlue would continue the relationship and its use of the Exchange beyond the next term of the contract.  Leslie appealed to fairness and noted that Swipejobs was not looking for exorbitant rates for TrueBlue's use of the Exchange.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

100.    The parties ultimately reached an agreement under which TBI paid an increased

██████████████████████████████████████████████████████████████████

████████████████████████████

101.    TrueBlue never agreed to a payment structure conforming with the original

payment term of the Exchange Agreement and continues to pay a ████████████████

██████████████

### 2.    TrueBlue Took Credit for the Exchange

102.    TrueBlue also engaged in a concerted effort to downplay Swipejobs' involvement

in public, clearing the way for TrueBlue to portray the Swipejobs Exchange as its own solution.

Most notably, Swipejobs referred to a feature of the Exchange consisting of job card choices

presented to associates as the "Job Stack."  In 2016, after beginning to use the Swipejobs

Exchange, TrueBlue decided it wanted to call its branded version of the Exchange "JobStack."

TrueBlue verbally requested the use of the JobStack name then emailed an agreement to

Swipejobs requiring Swipejobs to assign its trademark rights in JobStack to TrueBlue.

103.    To satisfy its new partner, and because Swipejobs was not invested in the name

JobStack on a higher level, Swipejobs signed the proposed agreement to assign the JobStack

mark to TrueBlue.  From then on, the branded version of the Exchange provided to TrueBlue

was called "JobStack."

104.    Relatedly, TrueBlue insisted on a provision in the Exchange Agreement that

Swipejobs could not publicly disclose its role in the creation or maintenance of JobStack.

Specifically, the 2015 contract stated that ████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████    Exchange Agreement, § 3.2.

105.    This became particularly problematic in 2019 when TrueBlue started applying for

(and winning) industry awards for JobStack, TrueBlue's branded version of Swipejobs'

Exchange.  Between 2019 and 2023, TrueBlue won 12 awards for JobStack.  These accolades

imply that TrueBlue is the creator and owner of the JobStack platform, which is not the case.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

106.    For example, a press release dated November 30, 2023, states that TrueBlue won "two awards from the International Awards Associate (IAA) for its groundbreaking JobStack app. . . . [W]ith its game-changing technology, JobStack connects people and work 24/7. JobStack has been downloaded by more than three million job seekers and has helped businesses fill more than 14 million shifts since its launch."  The numbers touted therein refer to accomplishments enabled through TrueBlue's use of Swipejobs' Exchange.

107.    Similarly, one of the two TrueBlue executives working directly with Swipejobs states on his LinkedIn profile that he built a "Product Management team to design and implement an industry leading staffing mobile application, which earned a Platinum TITAN Business award in 2023."  At this time, TrueBlue was still using the Swipejobs Exchange.

108.    TrueBlue routinely represented the Swipejobs Exchange as its own during quarterly earnings calls.  For example, during the Q2 2019 earnings call, Beharelle stated: "As many of you know, our digital transformation via our JobStack mobile app is one of the most important strategic initiatives within PeopleReady.  Our JobStack mobile app is transforming the way we do business."

109.    During the Q2 2021 earnings call, Beharelle stated: "JobStack heavy client users continue to post better year-over-year revenue growth rates compared to the rest of the customer base, with the Q2 2021 growth differential exceeding 40 percentage points on a same customer basis.  This growth differential is largely driven by wallet share takeaways from competitors as heavy client users tell us a major reason they are moving share to PeopleReady is due to JobStack's unique capabilities."

110.    TrueBlue's actions and statements described above illustrate its acknowledgment of the economic value and "groundbreaking" nature of the Exchange and Swipejobs' trade secrets contained therein.

### F.    TrueBlue Misled Swipejobs Regarding its Development of JobStack 2

111.    While the Exchange Agreement expressly grants TrueBlue the right to develop its own solution competing with the Swipejobs Exchange, key TrueBlue personnel with complete

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

access to and knowledge of the Exchange went out of their way to assure Swipejobs that TrueBlue had no intention of building such a solution throughout 2019 and most of 2020. Those assurances were disingenuous and TrueBlue acknowledged as much when Swipejobs discovered the deception. At this point, Swipejobs questioned TrueBlue personnel as to why they went out of their way to deceive Swipejobs when it had the right to build its own platform.

### 1.    TrueBlue Hid its Development for Over a Year

112.    In October 2019, Beharelle sent an email to Leslie asking how TrueBlue could ensure it would not infringe on Swipejobs' intellectual property rights in the event it sought to develop its own solution. Leslie's response reminded Beharelle of TrueBlue's obligations under the Exchange Agreement and noted that Swipejobs' rights in the Exchange had only broadened since the inception of the relationship. Swipejobs offered to work with TrueBlue to ensure there was no breach of Swipejobs' rights under the contract or otherwise, an offer that was always on the table.

113.    The PeopleReady Senior Vice President ("SVP") of Operations and Innovation at the time communicated to Swipejobs that TrueBlue had no intention of building its own solution.

114.    In March 2020, he again assured Swipejobs that TrueBlue was neither building nor planning on building its own solution. He further reiterated that conversations regarding the protection of Swipejobs' rights were unnecessary.

115.    In August 2020, TrueBlue's tale changed. Beharelle informed Swipejobs for the first time that TrueBlue had been working on its own solution for more than one year. When Swipejobs raised this discrepancy, the SVP of Operations and Innovation admitted to deliberately misleading Swipejobs and stated that he was simply doing what he was asked to do. This confused Swipejobs because deception was unwarranted under the terms of the Exchange Agreement.

116.    Swipejobs has gone out of its way to proactively raise potential issues that may arise during TrueBlue's development of its own solution in accordance with the implied

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

covenant of good faith and fair dealing. This was done to minimize conflicts and the potential for breach of the Exchange Agreement.

117.    Given the importance of Swipejobs' Proprietary Information, including its intellectual property and Confidential Information, that TBI had deliberately misled Swipejobs for at least 12 months regarding the development of its own solution, and that TBI was now ignoring offers to collaborate to ensure there were no issues, Swipejobs became concerned. With the assurances in place under the Exchange Agreement, Swipejobs had freely shared its Confidential Information with TrueBlue for over six years and it was unclear whether TrueBlue intended to build a solution that strictly complied with the terms of the Exchange Agreement by not including any of the ███████████████████████████████████████████ ████████

118.    TrueBlue was not concerned and attempted to reassure Swipejobs that it was following the Exchange Agreement. In response to repeated offers from Swipejobs to collaborate to avoid any breach of the Exchange Agreement and to protect Swipejobs' rights, TrueBlue stated that it would "have to go out of its way" to breach the Exchange Agreement. TrueBlue further stated that it was taking a "clean room" approach to the development, ensuring that none of Swipejobs' source code or patents were implicated or infringed in the development process.

119.    In response, Swipejobs pointed to the critical contract provisions governing TrueBlue's development, which ████████████████████████████ █████████████████

120.    TrueBlue rejected Swipejobs' offers to work collaboratively and forged ahead with its development.

### 2.    Swipejobs Proactively Raised Concerns

121.    On October 1, 2020, TrueBlue sent a letter to Swipejobs purporting to address Swipejobs' concerns with the development of the new solution. Specifically, TrueBlue stated it was "unaware of any incorporation or use of the intellectual property of swipejobs in [its] mobile

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

solution development," that the "TrueBlue engineering teams working on [the] mobile solution have never had access to the intellectual property of swipejobs," and that TrueBlue had "taken extensive steps to ensure that [its] mobile solution is developed and designed independently and is based on the needs of [its] workers and customers—and specifically, the unique input [it had] learned directly from both."

122.    On October 18, 2020, Swipejobs responded to TrueBlue's letter reiterating its desire to cooperate during the development of TrueBlue's solution, reminding TrueBlue it "has been heavily exposed to (at the most detailed level to easily recreate) every aspect of [its] intellectual property and confidential information for over 5 1/2 years" and that Swipejobs' rights extend far beyond registered patents and source code.

123.    On November 2, 2020, TrueBlue sent a response letter to Swipejobs downplaying its concerns with respect to the potential for infringement.  TrueBlue stated that Swipejobs must "describe what IP is 'likely' to be used either based on the process options as you understand them or based on what the infringing elements are with some level of specificity."

124.    On November 26, 2020, Swipejobs responded to TrueBlue to reiterate that the Exchange Agreement has clauses to cover the exact situation where TrueBlue builds its own solution, and that code and registered IP were not the core areas of concern, despite being what TrueBlue was focused on.  Swipejobs reiterated that TrueBlue had been exposed to its Confidential Information and intellectual property in intimate detail related to the Exchange generally and Swipejobs' continuous updates to the Exchange.

125.    While Swipejobs' concerns remained, and it later learned upon reviewing TrueBlue's JobStack 2 solution in 2024 that those concerns were warranted, at the time of these communications, it was reasonable for Swipejobs to take its partner's reassurances at face value, particularly given the repeated statements from key TrueBlue executives, including those of Taryn Owen as explained below.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

### 3.   TrueBlue Cast Doubt on the Viability of the New Solution

126.    The deception did not end there.  After her December 2019 appointment as President of PeopleReady, Taryn Owen started to engage with Swipejobs through Jane Hussey, the Executive Director and the Senior Leader of Swipejobs responsible for the TrueBlue partnership.  To Swipejobs, Owen seemed to become a staunch proponent of maintaining the partnership between Swipejobs and TrueBlue.  Owen communicated her disagreement with Beharelle's decision to have TrueBlue build its own solution to Swipejobs along with her doubts as to whether TrueBlue could even achieve this.  Over time, however, it became apparent to Swipejobs that Owen's position was the opposite of what she presented to Swipejobs.

127.    On March 26, 2021, Owen held a telephone meeting with Hussey during which Owen stated TrueBlue would hold an internal product review meeting assessing the additional features of the Swipejobs Exchange that TrueBlue had declined to switch on.  The purpose of this internal review was to determine whether expansion of the relationship with Swipejobs would be fruitful.

128.    Leading up to the product review, Hussey called Owen to inquire whether the team reviewing the Swipejobs Exchange was involved in building the TrueBlue solution.  Owen assured Hussey that TrueBlue operated two separate teams—one reviewing the Exchange that reported to her, and one building the TrueBlue solution that reported to Jeff Dirks, TrueBlue's then-Chief Technology and Information Officer.  Owen reiterated her support for expanding the relationship with Swipejobs and expressed her pessimism regarding the TrueBlue solution.  Owen further stated that her goal was to extend the Exchange Agreement beyond 2022.

129.    On April 29, 2021, Swipejobs held the product review demonstration of the Exchange, which detailed the full functionality of the Exchange, including all additional features TrueBlue had declined to switch on.  The TrueBlue personnel in attendance were Owen, Betori, Chris Davis (then-Senior Director of Product Management), Meishelle Haverkamp (then-Vice President of Product Management), Brian Vile (Vice President of Product Management), and Jeroen Decker (then-Vice President of Business Enablement).  While unknown to Swipejobs at

COMPLAINT - 28
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

the time, several of these individuals were playing key roles in the development of the competing TrueBlue solution, contrary to Owen's false representation that the build team was separate from the Exchange review team.

130.    In May 2021, Owen asked Hussey to assemble information concerning the financial and commercial outcomes of TrueBlue's use of the Swipejobs Exchange.  Owen said she had attended a recent TrueBlue Board meeting where she told the Board that she trusted Swipejobs to always deliver and her goal was to convince the Board to keep using the Swipejobs Exchange.  Owen said she had "no confidence in Jeff Dirks" and felt her job was at risk if TrueBlue rolled out the solution he was building.  Swipejobs provided all requested information.

131.    On June 13, 2022, Owen and Hussey held a meeting in which Owen said TrueBlue was incapable of building its own platform and asked Swipejobs to do a review of TrueBlue's existing technology and how Swipejobs could address TrueBlue's technology issues. Swipejobs conducted this review at no cost and showed detailed Swipejobs Exchange functionality and demonstrations that would solve these technological issues.

132.    Beharelle resigned effective immediately on June 14, 2022, and Steve Cooper, the Board Chairman at the time, took over as CEO.  Cooper initiated a review by independent consultants of the TrueBlue solution under development compared to the Swipejobs Exchange. Swipejobs was asked to participate and shared information, including demonstrating the positive financial and business impact of the Swipejobs Exchange on TrueBlue's business.

133.    Swipejobs participated in the independent review of the TrueBlue solution, providing detailed demonstrations of the Swipejobs Exchange and sharing its Confidential Information and the SJ Trade Secrets with individuals who (unknown to Swipejobs at the time) played key roles in the development of the TrueBlue solution.

134.    Owen repeatedly represented this process to Swipejobs as an opportunity to deepen TrueBlue's use of the Swipejobs Exchange and constantly stated that she did not understand why the Board made the decision to build the TrueBlue platform. She also stated that

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

she inherited the decision and did not agree with it because she felt Jeff Dirks and the TrueBlue technology team had no chance of successfully building their own solution.

135.    After the conclusion of the independent review, TrueBlue and Swipejobs agreed to a three-year contract for TrueBlue's continued use of the branded Exchange and the provision of Swipejobs' related consulting services.

136.    Owen continued to express her affinity for the Swipejobs Exchange and the partnership with Swipejobs even after becoming President and CEO of TrueBlue in August 2023.  In the final meeting between Owen and Hussey on May 20, 2024, in Kansas City, Owen said she was surprised at her team's progress, as she expected them to fail.  She said the TrueBlue Board was very concerned about the cost of their own technology developments and that she expected the Board to shut down the project due to cost blowouts.

**G.    TrueBlue Repeatedly Requested Confidential and Trade Secret Information**

137.    TrueBlue frequently requested Swipejobs' Confidential Information throughout these product reviews and beyond.  These requests were particularly regular between 2019 and 2022, which was a critical period of development for TrueBlue's solution, though they have continued through as late as 2024.

138.    TrueBlue specifically requested detailed technical information concerning the structure, ideas, and know-how underlying the Swipejobs Exchange.

139.    Based on Taryn Owen's repeated duplicitous representations, Swipejobs assumed that providing the requested information would increase the chances of TrueBlue extending the parties' partnership.  Thus, Swipejobs provided the requested information in good faith.  This included detailed product demonstrations, one-pagers detailing specific features of the Exchange, performance monitoring metrics, workflows, presentations walking through specific functionality, feature descriptions, detailed quotes, and more.

140.    Much of the requested Confidential Information concerned the SJ Trade Secrets. For example, Swipejobs provided upon request extensive presentations, manuals, and technical

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

documents detailing how to navigate the Service Desktop and how trade secret features such as the Rates Engine work.

141.    Swipejobs provided the requested Confidential Information with the understanding that it would be treated confidentially as required by the Exchange Agreement. Swipejobs was unaware of TrueBlue's misuse of it is Proprietary Information, including misappropriation of its trade secrets and Confidential Information, in JobStack 2 until it was able to review TrueBlue's Worker App solution in May 2024.

**H.    TrueBlue Secretly Filed for Patents on Swipejobs' Intellectual Property**

142.    Despite TrueBlue's initially misleading comments regarding the development of its competing solution, Swipejobs had no reasonable basis to suspect substantive duplicity or blatant theft of Swipejobs' Proprietary Information until Swipejobs became aware of the TrueBlue platform in the public domain in May 2024.  TrueBlue continued to request more information from Swipejobs under the guise of extending the partnership.  These requests appeared legitimate, and Swipejobs—believing it was engaged in good-faith collaboration—provided comprehensive details about its confidential and trade secret information.

143.    However, TrueBlue had no intention of honoring the terms of the Exchange Agreement or the spirit of the relationship.

144.    Despite the Exchange Agreement's strict confidentiality provisions and Swipejobs' trade secret protection of its innovations, TrueBlue, on information and belief, exploited Swipejobs' intellectual property strategy by harvesting Swipejobs' Confidential Information, the SJ Trade Secrets, and SJ's Patent Filings to file patent applications claiming Swipejobs' innovations as its own.

145.    On information and belief, TrueBlue deliberately concealed its actions.  TrueBlue filed its applications in secret, without informing Swipejobs of its intent to do so and without providing Swipejobs an opportunity to review or consent to the filings.  Swipejobs had no reason to investigate the public record for TrueBlue's filings, as it reasonably relied on the Exchange Agreement's protections and had no notice or indication of TrueBlue's breach.  Indeed, Section

6.2 of the Exchange Agreement makes clear that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████   Additionally, the Exchange Agreement expressly grants to Swipejobs ██

████████████████████████████████████████████

████████████████████████████

146.   TrueBlue's scheme came to light only recently, in February 2025.  This was the first time Swipejobs learned of any patent filings by TrueBlue based on Swipejobs' Confidential Information.  This unexpected revelation prompted Swipejobs to investigate TrueBlue's patent activities further.

147.   Upon further investigation, Swipejobs uncovered a broader pattern of misconduct: TrueBlue made numerous other patent filings that are public and may have made additional filings that are not public (collectively "TrueBlue's Patent Filings") that encompass subject matter derived directly from Swipejobs' Confidential Information, and specifically, the SJ Trade Secrets.  TrueBlue's Patent Filings post-dated Swipejobs' own patent filings and included subject matter that is based on, related to, contains, and/or claims Swipejobs' innovations and Confidential Information.

148.   Several of TrueBlue's Patent Filings also copied figures and written disclosures from Swipejobs' earlier patent filings.

149.   TrueBlue's Patent Filings include, but are not limited to, four patent families consisting of issued patents and pending applications.

150.   TrueBlue's improperly acquired patents serve to exclude Swipejobs from making, using, selling, or offering to sell its own inventions, depriving Swipejobs of its right to possess its own Proprietary Information.

COMPLAINT - 32
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1

### 1. Patent Family 1

151.    On January 26, 2021, TrueBlue filed U.S. Patent Application No. 17/159,015 (the '015 Application), entitled "Recommendation platform for skill development."  TrueBlue also filed a nonpublication request for the '015 Application.  The '015 Application claims priority to U.S. Provisional App. No. 63/017,243 filed on April 29, 2020.  Through a series of continuation patent applications, the '015 Application spawned a family of U.S. patent applications and granted patents (collectively the "TrueBlue Patent Family 1"), including:

- U.S. Patent No. 11,790,163 (the '163 Patent);

- U.S. Patent No. 12,112,126 (the '126 Patent);

- U.S. Patent No. 11,989,504 (the '504 Patent);

- U.S. Patent No. 11,822,881 (the '881 Patent);

- U.S. Patent App. No. 18/811,518 (the '518 Application);

- U.S. Patent App. No. 18/487,756 (the '756 Application); and

- U.S. Patent App. No. 18/668,376 (the '376 Application).

152.    The TrueBlue Patent Family 1 names Christopher A. Kapcar, Richard Paul Betori, Jeffrey Howard Rash, Robert Michael Ward, Jeffrey S. Dirks, Jeroen Anton Decker, and Shawn David Dillenbeck as inventors.  Significantly, two of these named inventors, Betori and Decker, had complete access to all of Swipejobs' Confidential Information , know-how, structure, and SJ Trade Secrets pursuant to the Exchange Agreement.  This included demonstrations of all aspects of the Exchange, Swipejobs' confidential know-how, and SJ Trade Secrets, all of which were protected by confidentiality obligations under the Exchange Agreement.  Worse yet, Betori and Decker were filing this patent family at the same time Betori was asserting that TrueBlue would never build its own solution.  Then, a short time later, once TrueBlue's plans to build its own solution were made known to Swipejobs, TrueBlue then asserted that a carefully managed "clean room" that protected Swipejobs' Confidential Information was in place.  Both assertions were lies.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

153.    Compelling evidence of misappropriation is found in the TrueBlue Patent Family 1.

154.    FIGs. 1 and 2 of the TrueBlue Patent Family 1 copy Figures 1 and 2 of Swipejobs' '389 Patent, and FIG. 3 of the TrueBlue Patent Family 1 effectively copies Figure 3 of Swipejobs' '389 Patent.









**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

swipejobs' '389 Patent                    TrueBlue Patent Family 1



155.    The specification of the TrueBlue Patent Family 1 mentions, discussing its FIG. 3, that "[t]he server processing system includes . . . a learned profile engine" shown in FIG. 3 of both TrueBlue Patent Family 1 and Swipejobs' '389 Patent.

156.    At least one claim in the TrueBlue Patent Family 1 recites technology developed by Swipejobs and derived directly from Swipejobs' Confidential Information that was disclosed to TrueBlue under the strict confidentiality protections of the Exchange Agreement.

157.    As an example, claim 1 of the '163 Patent, claim 1 of the '126 Patent, and claim 1 of the '518 Application each recite Swipejobs' Confidential Information.  These claims recite the concept of "near-miss" tasks.

158.    This "near-miss" technology represents a core component of Swipejobs' Conditional Dispatch Trade Secret, which Swipejobs developed and maintains as confidential.

159.    Swipejobs disclosed detailed processes, flowcharts, and proprietary know-how related to the Conditional Dispatch Trade Secret to TrueBlue prior to April 29, 2020—the earliest possible priority date for the TrueBlue Patent Family 1.

160.    Other claims in the TrueBlue Patent Family 1 recite technology developed by Swipejobs.

161.    As an example, claim 1 of the '504 Patent and claim 1 of the '376 Application each recite Swipejobs' inventions.  These claims recite "executing an application that

COMPLAINT - 35
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

coordinates users with real-world tasks, wherein the application further tracks a performance criterion of a first user in response to performing the real-world tasks coordinated by the application, and wherein each of the real-world tasks comprises a short-term, temporary employment opportunity."

162.    This performance tracking technology represents a core component of Swipejobs' Proprietary Exchange Features, which Swipejobs developed.  Specifically, Swipejobs' Proprietary Exchange Features track performance criterion of workers to determine and maintain records of worker reliability, ratings, and other metrics.

163.    Swipejobs disclosed detailed processes, flowcharts, and proprietary know-how related to the Proprietary Exchange Features to TrueBlue prior to April 29, 2020—the earliest possible priority date for the TrueBlue Patent Family 1.

164.    As another example, claim 1 of the '881 Patent and claim 1 of the '756 Application each recite Swipejobs' inventions.  These claims recite "generating a set of skill tags associated with events that are posted on a temporary staffing application, wherein each of the set of skill tags indicates a skill employed by a given user during performance of a respective event, the temporary staffing application including a userbase that accepts and staffs the events, the userbase having profiles."

165.    This skill tracking technology represents a core component of Swipejobs' Proprietary Exchange Features, which Swipejobs developed.  Specifically, Swipejobs' Proprietary Exchange Features record and track worker skill tags that are used to match workers to jobs.

166.    Despite being based on, relating to, containing, and/or claiming Swipejobs' Confidential Information and inventions, none of Swipejobs' inventors were named as inventors in the TrueBlue Patent Family 1.

167.    TrueBlue also made no effort to correctly assign the TrueBlue Patent Family 1 filings to Swipejobs.  Instead, TrueBlue acted in secrecy, in breach of the Exchange Agreement, and in blatant disregard for Swipejobs' intellectual property rights.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

168.    Moreover, the TrueBlue Patent Family 1 filings all relate to ███████████ ████████ under Section 6.2 of the Exchange Agreement, which provides that ███████████ ██████████████████████████████████████████████████ ████████████████████████    The TrueBlue Patent Family 1 is thus assigned to Swipejobs, along with the claimed features themselves.

169.    Further, the TrueBlue Patent Family 1 filings all relate to ██████████████ ██████████████████████████ to the Exchange and Exchange Software.  Section 6.2 of the Exchange Agreement expressly grants to Swipejobs ███████████████████████████ ████████████████████████████████████████████████████ ███████    For this additional reason, the TrueBlue Patent Family 1 is assigned to Swipejobs, along with the claimed features themselves.

170.    Despite this, TrueBlue has failed to acknowledge the ████████ assignment of the TrueBlue Patent Family 1 to Swipejobs as required by the Exchange Agreement.

### 2.    Patent Family 2

171.    On March 3, 2021, TrueBlue filed U.S. Patent App. No. 17/191,010 (the '010 Application), entitled "Dynamic geofencing for temporary work time validation."  The '010 Application claims priority to U.S. Provisional App. No. 63/016,158 filed on April 27, 2020. The '010 Application has resulted in U.S. patent applications and a granted patent (collectively the "TrueBlue Patent Family 2"), including:

- U.S. Patent No. 12,185,178 (the '178 Patent); and
- U.S. Patent App. No. 18/933,942 (the '942 Application).

172.    The TrueBlue Patent Family 2 names Richard Paul Betori, Eric Eugene Lawson, Christopher A. Kapcar, Robert Michael Ward, Jeffrey S. Dirks, and Jeroen Anton Decker as inventors.  As explained above, Betori and Decker had complete access to all of Swipejobs' Confidential Information, know-how, structure, and the SJ Trade Secrets pursuant to the Exchange Agreement.  This included demonstrations of all aspects of the Exchange, Swipejobs'

confidential know-how and trade secrets, all of which were protected by confidentiality obligations under the Exchange Agreement.

173.    Compelling evidence of misappropriation is found in the TrueBlue Patent Family 2.

174.    FIGs. 1 and 2 of the TrueBlue Patent Family 2 copy Figures 1 and 2 of Swipejobs' '389 Patent, and FIG. 3 of the TrueBlue Patent Family 2 effectively copies Figure 3 of Swipejobs' '389 Patent.

175.    At least one claim in the TrueBlue Patent Family 2 recites technology developed by Swipejobs.

176.    As an example, claim 1 of the '178 Patent recites Swipejobs' inventions.  This claim recites "executing an application having at least two groups of users, a first user class and a second user class, wherein user input from a first user of the first class causes the application to generate a first event, the first event having a physical location at a first location and occurring at a first timeframe, and wherein user input from a second user of the second class causes the application to sign the second user up for the first event," and "dynamically generating a temporary geofence based on the first timeframe and positioned at coordinates around the first location and associated with the second user."

177.    The claimed geolocation technology represents a core component of Swipejobs' Proprietary Geolocation Feature, which Swipejobs developed and described in its '212 patent.

178.    Additionally, Swipejobs disclosed detailed processes and proprietary know-how related to the Proprietary Geolocation Feature to TrueBlue prior to April 27, 2020—the earliest possible priority date for the TrueBlue Patent Family 2.

179.    Despite being based on, relating to, containing, and/or claiming Swipejobs' inventions, none of Swipejobs' inventors were named as inventors in the TrueBlue Patent Family 2.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

180.    TrueBlue also made no effort to correctly assign the patent filings to Swipejobs. Instead, TrueBlue acted in secrecy, in breach of the Exchange Agreement, and in blatant disregard for Swipejobs' intellectual property rights.

181.    The TrueBlue Patent Family 2 filings all relate to ████████████████████ under Section 6.2 of the Exchange Agreement, which provides that ████████████████ ██████████████████████████████████████████████ ████████████████    The TrueBlue Patent Family 2 is thus assigned to Swipejobs, along with the claimed features themselves.

182.    Further, the TrueBlue Patent Family 2 filings all relate to ██████████ ███████████████████ to the Exchange and Exchange Software.  Section 6.2 of the Exchange Agreement expressly grants to Swipejobs ███████████████████████ ██████████████████████████████████████████ ██████    For this additional reason, the TrueBlue Patent Family 2 is assigned to Swipejobs, along with the claimed features themselves.

183.    Despite this, TrueBlue failed to acknowledge the ████████ assignment of the TrueBlue Patent Family 2 to Swipejobs as required by the Exchange Agreement.

### 3.    Patent Family 3

184.    On July 19, 2021, TrueBlue filed U.S. Patent App. No. 17/379,708 (the '708 Application), entitled "Artificial intelligence machine learning platform trained to predict dispatch outcome."

185.    The '708 Application (the "TrueBlue Patent Family 3") names Carlos Lara Maldonado, Robert Michael Ward, Jeffrey S. Dirk, and Christopher A. Kapcar as inventors.

186.    Compelling evidence of misappropriation is found in the TrueBlue Patent Family 3.

187.    FIGs. 1 and 2 of the TrueBlue Patent Family 3 copy Figures 1 and 2 of Swipejobs' '389 Patent, and FIG. 3 of the TrueBlue Patent Family 3 effectively copies Figure 3 of Swipejobs' '389 Patent.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

188.    At least one claim in the TrueBlue Patent Family 3 recites technology developed by Swipejobs.

189.    As an example, claim 1 of the '708 Application recites Swipejobs' inventions. This claim recites "determining a pairing outcome, by the AI machine learning model, for each combination of each task of the set of future tasks and each associate of the set of associates, wherein the pairing outcome comprises a confidence score indicating a likelihood that a given associate will perform a paired task."

190.    The claimed modeling technology represents a core component of Swipejobs' Proprietary Probability of Fill Feature, which Swipejobs sought patent protection for in the '348 Application.  The '348 Application was filed before July 19, 2021—the earliest possible priority date for the TrueBlue Patent Family 3.

191.    Despite the TrueBlue Patent Family 3 claiming the same invention for which Swipejobs had already sought patent protection, none of Swipejobs' inventors were named as inventors in the TrueBlue Patent Family 3.

192.    TrueBlue made no effort to correctly assign the patent filings to Swipejobs.

193.    The TrueBlue Patent Family 3 filing relates to ███████████████████ under Section 6.2 of the Exchange Agreement, which provides that ███████████████ ████████████████████████████████████████████ ████████████████    The TrueBlue Patent Family 3 is thus assigned to Swipejobs, along with the claimed features themselves.

194.    Further, the TrueBlue Patent Family 3 filing relates to ████████████ ████████████████████████ to the Exchange and Exchange Software.  Section 6.2 of the Exchange Agreement expressly grants to Swipejobs ████████████████████████ ████████████████████████████████████████████ ████████    For this additional reason, the TrueBlue Patent Family 3 is assigned to Swipejobs, along with the claimed features themselves.

COMPLAINT - 40
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

195.    Despite this, TrueBlue failed to acknowledge the ███ assignment of the TrueBlue Patent Family 3 to Swipejobs as required by the Exchange Agreement.

### 4.    Patent Family 4

196.    On September 22, 2022, TrueBlue filed U.S. Patent App. No. 17/934,539 (the '539 Application), entitled "Machine Learning Model To Fill Gaps In Adaptive Rate Shifting." The '539 Application claims priority to U.S. Provisional App. No. 63/248,423 filed September 24, 2021.

197.    The '539 Application (the "TrueBlue Patent Family 4") names Robert Michael Ward, Christopher A. Kapcar, and Carlos Lara Maldonado as inventors.  On information and belief, at least one of the inventors either personally received and reviewed Swipejobs' Confidential Information during meetings with Swipejobs or subsequently gained access to it through electronic communications, all of which were protected by confidentiality obligations under the Exchange Agreement.

198.    Compelling evidence of misappropriation is found in the TrueBlue Patent Family 4.

199.    FIGs. 1 and 2 of the TrueBlue Patent Family 4 copy Figures 1 and 2 of Swipejobs' '389 Patent, and FIG. 3 of the TrueBlue Patent Family 4 effectively copies Figure 3 of Swipejobs' '389 Patent.

200.    At least one claim in the TrueBlue Patent Family 4 recites technology developed by Swipejobs and derived directly from Swipejobs' Confidential Information that was disclosed to TrueBlue under strict confidentiality protections of the Exchange Agreement.

201.    As an example, claim 1 of the '539 Application recites Swipejobs' Confidential Information.  This claim recites "dynamically computing a value responsive to the ad hoc request in real time with the ad hoc request, wherein the value is provided by the heuristic model when there is a match of the ad hoc request to the training data and derived by the machine learning model when there is no match of the ad hoc request to the training data."

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

202.    The specification of the TrueBlue Patent Family 4 publicly discloses technology developed by Swipejobs and derived directly from Swipejobs' Confidential Information that was disclosed to TrueBlue under strict confidentiality protections of the Exchange Agreement.

203.    As an example, the specification of the '539 Application discloses, "Other rules include identifying the average of an upper quartile of data. In some embodiments, the data implemented is of a broader set of shift circumstances than are selected. In such embodiments, some of the selected circumstances (e.g., inclusion of a background check) apply a static adjustment to the overall rate based on geography. Thus, in some embodiments the heuristic rules do not take a raw upper quartile average to arrive at an answer." '539 Application at [0049].

204.    The claimed rate setting technology represents a core component of Swipejobs' Rates Engine Trade Secret, which Swipejobs developed and maintains as confidential.

205.    Swipejobs disclosed detailed processes and proprietary know-how related to the Rates Engine Trade Secret to TrueBlue prior to September 24, 2021—the earliest possible priority date for the TrueBlue Patent Family 4.

206.    Despite being based on, relating to, containing, and/or claiming Swipejobs' Confidential Information, none of Swipejobs' inventors were named as inventors in the TrueBlue Patent Family 4.

207.    TrueBlue made no effort to correctly assign the patent filing to Swipejobs. Instead, TrueBlue acted in secrecy, in breach of the Exchange Agreement, and in blatant disregard for Swipejobs' intellectual property rights.

208.    The TrueBlue Patent Family 4 filing relates to ███████████████████ under Section 6.2 of the Exchange Agreement, which provides that ███████████████ ████████████████████████████████ ██████████████ The TrueBlue Patent Family 4 is thus assigned to Swipejobs, along with the claimed features themselves.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1    209.    Further, the TrueBlue Patent Family 4 filing relates to █████████

2    ████████████████████████ to the Exchange and Exchange Software.  Section 6.2 of the

3    Exchange Agreement expressly grants to Swipejobs ██████████████████████████████

4    ████████████████████████████████████████████████████

5    ███████  For this additional reason, the TrueBlue Patent Family 4 is assigned to Swipejobs,

6    along with the claimed features themselves.

7    210.    Despite this, TrueBlue failed to acknowledge the ████████ assignment of the

8    TrueBlue Patent Family 4 to Swipejobs as required by the Exchange Agreement.

9    **I.    The Functionality of JobStack 2 Copies the Swipejobs Exchange**

10    211.    TrueBlue launched what it claimed was its version of the JobStack application,

11    "JobStack 2," in or around October 2023.  The similarities between the Swipejobs Exchange and

12    TrueBlue's JobStack 2 are remarkable.  No other solution on the market contains the same

13    combination of the same features present in the Swipejobs Exchange.  These similarities can

14    only be explained through TrueBlue's misappropriation of Swipejobs' Confidential Information

15    and the SJ Trade Secrets.

16    212.    All parts of the Swipejobs Exchange are connected in real time.  When a change

17    is made in one part of the platform, it reflects in all other parts of the platform.  For example,

18    when a customer places an order on the Exchange, that order appears in real time in the apps of

19    all relevant associates and the associates receive a notification.  TrueBlue's JobStack 2 functions

20    the exact same way as the Swipejobs Exchange.

21    213.    The Swipejobs Exchange is worker-centric, meaning associates have access to

22    matched jobs 24/7.  In the Swipejobs Exchange, an associate can take a job and go to work

23    without further screening from the customer.  If the job has further requirements, the associate

24    can click an "I'm Interested" button that notifies an internal recruiter working for the Swipejobs

25    partner (for example, a recruiter working for TrueBlue).  JobStack 2 operates in the same way.

26    214.    The primary revenue transactions of the Swipejobs Exchange are: (1) "Reorder,"

27    where the customer uses a previous order to order again; (2) "Extend Order," where the customer

can extend an associate's assignment themselves without recruiter involvement; and (3) "Invite Back," where previous associates are ranked pursuant to a customer-specific rating and the customer can invite those workers, who then immediately receive the customer's invitation on their phone. JobStack 2 includes all these transactions.

215.    Swipejobs built the Exchange to match associates with the best jobs based on factors such as skills, experience and preferences.  In fact, the Swipejobs Exchange will even factor in associates' prior work history to fine-tune its matching algorithm based on data beyond the user's affirmative input.  This was a major shift in the temporary staffing industry—competing solutions merely listed all available jobs without factoring in the worker's preferences or prior work history including ratings and reliability.  JobStack 2 incorporates the same matching functionality.

216.    Unlike other platforms, the Swipejobs Exchange uses automation to reduce delays and friction caused by manual recruiter steps.  The Exchange obviates the need for human intervention in most interactions between the customers and the workers.  JobStack 2 uses automation in the same way.

217.    The Swipejobs Exchange integrates time and attendance with either the associate entering hours and the customer approving them or the customer entering hours and the associate confirming them.  In states where breaks are a statutory requirement, the platform captures the break times for compliance and reporting purposes.  Where the two parties agree on the reported hours worked, the hours are then sent to payroll for processing.  TrueBlue's JobStack 2 platform works the same way.

**J.    JobStack 2 is a Product of Breach and Trade Secret Misappropriation**

218.    On information and belief, JobStack 2 incorporates many of the SJ Trade Secrets and was created through the misappropriation of Swipejobs' trade secret information, including at least the Service Desktop, the Priority Actions Trade Secret, the Customer Invitation Trade Secret, the Reliability Service Trade Secret, and the Rates Engine Trade Secret.  TrueBlue also had access to and, on information and belief, improperly used its knowledge of, Swipejobs'

COMPLAINT - 44
NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Matching Information on Service Desktop Trade Secret and Conditional Dispatch Trade Secret to shortcut its research and development of JobStack 2.

219.    Given the challenge of building a transaction platform that interacts in real time that only one staffing technology company, Swipejobs, had previously built successfully, TrueBlue's use and consideration of the SJ Trade Secrets in developing JobStack 2 gave it an unfair competitive advantage that was not permitted under the Exchange Agreement. On information and belief, regardless of whether TrueBlue actually incorporated each of the SJ Trade Secrets into JobStack 2, TrueBlue misappropriated them by using its knowledge of them to inform its development of the functionality of JobStack 2.

220.    TrueBlue has promoted a backend interface similar to Swipejobs' Service Desktop, which is maintained as a trade secret, in its Q1 2024 quarterly earnings call.  In response to a question about the benefits from rolling out TrueBlue's "proprietary" JobStack 2 system, Owen stated: "for our internal staff, our field employees who are working so hard every day to put people to work, it has improved visibility for our field staff into orders and associates that are available through the desktop application."[1]

221.    TrueBlue's publicly available worker app and customer app both show that some transactions require a TrueBlue branch employee to take manual actions.  To know to take these actions, the TrueBlue employee must be alerted to these actions in their backend interface.  On information and belief, including due to TrueBlue's requests for information about the Priority Actions Trade Secret, TrueBlue improperly used the Priority Actions Trade Secret to achieve this functionality in JobStack 2.

222.    TrueBlue promotes features of JobStack 2 that are based on Swipejobs' Matching Information on Service Desktop Trade Secret on its own PeopleReady website, which states: "Our team can collaborate with you to gain access to PeopleReady jobs that require additional skills, ensuring you're well-prepared and positioned for success in your job search."

---

[1] https://d1io3yog0oux5.cloudfront.net/_551d7f7e208f09630259c62e19208dfd/trueblue/db/2278/21633/webcast_transcript/TBI+2024+Q1+Corrected+Transcript.pdf.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

223.     TrueBlue's PeopleReady website also promotes features of JobStack 2 that are based on Swipejobs' Reliability Service Trade Secret.  It states: "The following can result in disciplinary action, including termination: No call no show[,] Late without informing branch[,] [or] Leaving early from a jobsite without prior notification."

224.     On information and belief, TrueBlue's JobStack 2 solution also misappropriates Swipejobs' Rates Engine Trade Secret.  TrueBlue continued to request additional detail on Swipejobs' Rates Engine Trade Secret *after* it surreptitiously filed its own patent application that improperly discloses the Rates Engine Trade Secret and began rolling out its JobStack 2 solution, including as late as November 2024.

225.     Further to TrueBlue's history of claiming Swipejobs' work as its own, Owen began making public statements touting the purportedly unique functionality of its JobStack 2 solution.  However, these functions all existed in the Swipejobs Exchange and were developed by Swipejobs, not TrueBlue.

226.     On May 7, 2024, Owen made statements about the "real-time insight" of JobStack 2 as if TrueBlue originated the idea of the seamless, interactive Swipejobs Exchange. Specifically, Owen said: "We are excited about the opportunities this real-time insight creates, allowing us to implement competitive enhancements faster and making it easier for our customers and associates to engage with us."  Of course, TrueBlue had enjoyed this functionality since it started using the Exchange.

227.     On an August 5, 2024 quarterly earnings call, Owen went so far as to refer to JobStack 2 as the "Exchange" while promoting other Swipejobs-developed features integrated into JobStack 2.  Specifically, Owen said: "Our associates are now able to onboard completely in – through the digital application, reducing the time that it takes them to apply and ultimately get dispatched and paid for work."  Of course, Swipejobs incorporated a digital onboarding feature in the Exchange in 2020.  Owen continued: "In addition to that, we just launched a text reminder. So, our associates get a reminder before a shift and they can respond to us and say, yes, they're going to show up for their shift today or no, they need to call off, in which case that job

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

automatically goes back ***to the Exchange***, allowing another associate to take the shift." This reminder is yet another feature that Swipejobs developed and put in the Exchange in 2018. The promotion of features lifted directly from the Swipejobs Exchange in conjunction with the actual reference to JobStack 2 as "the Exchange" is telling—TrueBlue set out to create its own version of the Swipejobs Exchange using Swipejobs' Confidential Information and the SJ Trade Secrets.

228.    In an earnings call held November 4, 2024, Owen promoted additional features that had long been incorporated in the Swipejobs Exchange. She stated: "We are excited by the early success of our launch as we leverage real-time insights to implement enhancements. For example, customers shared their desire for an easy way to get high-performing associates back on their worksites, and we responded quickly with an exclusive invite feature that connects the associate to the customer using a fast and seamless experience. . . . And on the customer side, we've made an order extension feature more intuitive, making it easier for a customer to essentially extend an associate that is working on their customer site in a very easy and user-friendly way." Again, the invite back and order extension features were popular transactions and available in the Swipejobs Exchange platform from the beginning.

229.    The extent of these similarities is no coincidence. Over the parties' ten-year relationship, Swipejobs routinely shared detailed information demonstrating and explaining these features (and others) in intricate detail. The fact that no other staffing firm has developed a solution with the same structure, or incorporating any of these novel features, let alone this specific mix of features, further demonstrates TrueBlue's breach of contract, misappropriation of the SJ Trade Secrets, and overall copying of the Swipejobs Exchange.

230.    Other staffing firms that have failed to recreate the Swipejobs Exchange have significantly higher valuations than TrueBlue. While other global staffing firms have annual revenue above $20 billion, TrueBlue's annual revenue is only $1.56 billion. The fact that TrueBlue could develop JobStack 2 with significantly more limited resources than its competitors is further evidence of the shortcuts TrueBlue took by using Swipejobs' Confidential Information.

COMPLAINT - 47
NO. 2:25-cv-01545

231.    Even dedicated technology-first companies building digital platforms have failed to develop solutions close to the Swipejobs Exchange.

232.    Both TrueBlue's breach of the Exchange Agreement and misappropriation of the SJ Trade Secrets were done purposefully and with knowledge of the value of the Exchange and its features and functionality, including the SJ Trade Secrets.  TrueBlue's willful conduct was meant to significantly reduce the time and cost necessary to build and launch the first and only comparable on-demand temporary labor solution on the market, thereby harming Swipejobs and the value of its Exchange.

233.    TrueBlue's conduct was done willfully and with at least reckless disregard for Swipejobs and its rights and interests.

234.    There is no explanation for the directly comparable nature of the Swipejobs Exchange and JobStack 2 other than TrueBlue's extensive breach of Swipejobs' rights under the Exchange Agreement and misappropriation of the SJ Trade Secrets.

## COUNT I:  Breach of Contract (Section 2.3) – Reverse Engineering

235.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

236.    Swipejobs and TrueBlue are parties to the Exchange Agreement dated November 12, 2015, and amendments thereto.

237.    The Exchange Agreement is a valid, binding, and enforceable written contract signed by both parties, and its terms are in full force and effect.

238.    The promise by TrueBlue not to ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ is a material provision of the Exchange Agreement and part of the consideration provided by TrueBlue in exchange for Swipejobs providing TrueBlue with a branded version of the Exchange and related support services, including access to Swipejobs' proprietary Service Desktop and documentation.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

239.    TrueBlue breached Section 2.3 of the Exchange Agreement by reverse engineering, disassembling and attempting to discover the underlying structure, architecture, ideas, know-how, workflows, and functionality of the Exchange, including through its access to the Service Desktop and user manuals, one-pagers, specifications, and other technical materials delivered by Swipejobs to TrueBlue in connection with the Exchange Agreement.

240.    TrueBlue further breached Section 2.3 by using this information to modify aspects of the Exchange, including the Service Desktop, and create its own JobStack 2 solution that mirrors the structure and functionality of the Exchange.

241.    TrueBlue's breaches have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which Swipejobs has no adequate remedy at law.

242.    As a direct and proximate result of TrueBlue's breach of contract, Swipejobs has suffered damages in an amount to be determined at trial.

243.    Swipejobs is entitled to equitable relief, specific performance, and damages to be determined at trial.

### COUNT II: Breach of Contract (Section 5.2)

### Improper Use of Confidential Information

244.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

245.    Section 5.2 of the Exchange Agreement limits a party's right to use the other's Confidential Information ███████████████████████████████████████████████ ████████████████

246.    Under the Exchange Agreement, Swipejobs' "Confidential Information" specifically includes, without limitation, ████████████████████████████████ █████████████████████████████████████"

247.    Pursuant to the terms of the Exchange Agreement, Swipejobs routinely provided its Confidential Information to TrueBlue in the form of one-pagers, product demonstrations,

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1  specifications, workflows, and other means detailing the functionality, structure, and technical

2  know-how embodied in the Swipejobs Exchange.

3       248.    TrueBlue's right to develop a solution competitive with the Exchange is and

4  always has been subject to ████████████████████████████████████████

5  ████████████████████████████████████████ the Exchange Agreement.  Exchange

6  Agreement, § 4.1; ]Amendment Agreement No. 4, ¶ 4.1.4; Amendment Agreement No. 5, ¶ 8.1.

7       249.    Neither the definition of Swipejobs' Confidential Information nor the parties'

8  respective rights and obligations concerning Confidential Information have changed throughout

9  the course of the parties' contractual relationship.  In all eight amendments to the Exchange

10  Agreement, TrueBlue agreed to these terms.

11       250.    The promise by TrueBlue to use Swipejobs' Confidential Information only ████

12  ████████████████████████████████████████████████ is a

13  material provision of the Exchange Agreement and part of the consideration provided by

14  TrueBlue in exchange for Swipejobs' performance under the agreement.

15       251.    TrueBlue sought and used Swipejobs' Confidential Information to build its own

16  JobStack 2 solution in breach of the Exchange Agreement and in violation of Swipejobs' rights

17  in its Confidential Information.

18       252.    JobStack 2 incorporates Swipejobs' Confidential Information.  Specifically,

19  JobStack 2 incorporates what TrueBlue learned about the proprietary features, functionality, and

20  performance of the Swipejobs Exchange from Swipejobs.

21       253.    TrueBlue breached Section 5.2 of the Exchange Agreement by exceeding the

22  scope of its permissible use of Swipejobs' Confidential Information, namely, by using

23  Swipejobs' Confidential Information to build a solution that violates ████████████████

24  ████████████████████████████████████████ the

25  Exchange Agreement.

26

27

COMPLAINT - 50

NO. 2:25-cv-01545

254.     TrueBlue's breaches have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which Swipejobs has no adequate remedy at law.

255.     As a direct and proximate result of TrueBlue's breach of contract, Swipejobs has suffered damages in an amount to be determined at trial.

256.     Swipejobs is entitled to equitable relief, specific performance, and damages to be determined at trial.

## COUNT III: Breach of Contract (Section 5.2) – Improper Disclosure and Use of Confidential Information in TrueBlue's Patent Applications

257.     Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

258.     TrueBlue's Patent Filings include patent applications and patents based on, relating to, containing, and claiming Swipejobs' trade secrets, including the Conditional Dispatch and Rates Engine Trade Secrets. The Patent Filings include at least the '163 Patent, the '126 Patent, the '518 Application, and the '539 Application.

259.     TrueBlue's Patent Filings, including at least the '163 Patent, the '126 Patent, the '504 Patent, the '881 Patent, the '518 Application, the '756 Application, the '376 Application, and the '539 Application, disclose Swipejobs' trade secrets, including the Conditional Dispatch and Rates Engine Trade Secrets, and other Confidential Information, including the Proprietary Geolocation Feature, to the public.

260.     TrueBlue breached Section 5.2 of the Exchange Agreement by exceeding the scope of its permissible use of Swipejobs' Confidential Information by disclosing this information in its patent filings in violation of ███████████████████████ ██████████████████████████████████ under the Exchange Agreement.

261.     TrueBlue also breached Section 5.2 of the Exchange Agreement by exceeding the scope of its permissible use of Swipejobs' Confidential Information by using Swipejobs' Confidential Information to acquire patent rights to which it was not entitled—in violation of

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

████████████████████████████████████████████████████████

████████████ under the Exchange Agreement.

262.    Swipejobs had no reason to investigate the public record for TrueBlue's patent filings, as it reasonably relied on the Exchange Agreement and had no notice or indication of TrueBlue's breach.

263.    TrueBlue's breaches have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which Swipejobs has no adequate remedy at law.

264.    TrueBlue has been unjustly enriched by its breaches of Section 5.2 of the Exchange Agreement, including through the acquisition of patents containing Confidential Information in breach of Section 5.2.

265.    As a direct and proximate result of TrueBlue's breach of contract, Swipejobs has suffered damages in an amount to be determined at trial.

266.    Swipejobs is entitled to equitable relief, specific performance, and damages to be determined at trial.

**COUNT IV: Breach of Contract (Section 6.2) – Improper Assignment**

267.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

268.    Section 6.2 of the Exchange Agreement defines as ████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████

269.    Under the Exchange Agreement, TrueBlue ██████████████████████
████████████████████████████████████████████████

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

270.    Further, the Exchange Agreement expressly grants to Swipejobs ███████████ ███████████████████████████████████████████ ████████████████.

271.    The Exchange Agreement assigned to Swipejobs all of TrueBlue's intellectual property rights related to Exchange Feedback Features and/or ███████████████ ████████████ to the Exchange and Exchange Software, including effecting an automatic assignment to Swipejobs of each of TrueBlue's patents.

272.    TrueBlue has filed applications for and has in some cases been granted patents related to Exchange Feedback Features and/or to ████████████████ ████████████ to the Exchange and Exchange Software, including the '163 Patent, '126 Patent, '504 Patent, '881 Patent, and '178 Patent, and the '518 Application, '756 Application, '376 Application, '942 Application, '708 Application, and '539 Application.

273.    Each of TrueBlue's patents and patent applications, including at least the '178, '881, '504, '163, and '126 Patents, and the '942, '708, '539, '518, '376, and '756 Applications, relates to Exchange Feedback Features and/or to ████████████████ ████████████ to the Exchange and Exchange Software, and is therefore covered by the scope of the Exchange Agreement's assignment provision.

274.    TrueBlue has not recorded any assignment of these patents or patent applications to Swipejobs.

275.    TrueBlue breached Section 6.2 of the Exchange Agreement by failing to acknowledge the █████ assignment to Swipejobs of TrueBlue's patents and patent applications relating to Feedback, Exchange Feedback Features, and/or to ███████████ ████████████████████ to the Exchange and Exchange Software, as defined by the Exchange Agreement.

276.    TrueBlue's breaches have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which Swipejobs has no adequate remedy at law.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

277.    TrueBlue has been unjustly enriched by its breach of Section 6.2, including by obtaining ownership of the patents and patent applications that are rightfully Swipejobs'.

278.    As a direct and proximate result of TrueBlue's breach of contract, Swipejobs has suffered damages in an amount to be determined at trial.

279.    Swipejobs is entitled to equitable relief, specific performance, and damages to be determined at trial.

### **COUNT V: Breach of the Implied Covenant – Hiding Solution Details**

280.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

281.    A primary purpose of the Exchange Agreement is to protect the proprietary information of Swipejobs and to ensure an honest working relationship between TrueBlue and Swipejobs.

282.    Although Section 4.1 allows TrueBlue to develop its own mobile solution that does not infringe, misappropriate, or otherwise violate or conflict with Swipejobs' rights, there is a gap in the Exchange Agreement as to how the parties would ensure that TrueBlue's development process respected those rights.

283.    Considering this gap, and the challenge of building a competing mobile solution in compliance with Section 4.2, there is an implied covenant for TrueBlue and Swipejobs to work together in good faith to ensure that TrueBlue's solution does not improperly use any of Swipejobs' Confidential Information, Exchange Feedback Features, or intellectual property, or otherwise breach the Exchange Agreement.  This implied covenant is consistent with the purpose of the Exchange Agreement and supported by the recitals and Sections 2.3, 4.1, 5.2, and 16.9 of the Exchange Agreement.

284.    TrueBlue did not tell Swipejobs that it was building its own digital platform until August 2020 when it revealed that TrueBlue had already been working on its platform for more than a year.  This news was surprising since prior to August 2020 TrueBlue executives proactively told Swipejobs that TrueBlue was *not* building its own platform.

**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

285.    In or around August 2020, TrueBlue asked Swipejobs, in the context of building a TrueBlue platform, how the parties could make sure that Swipejobs' intellectual property is protected.

286.    On September 8, 2020, Leslie explained that Swipejobs' recommendation is, and always has been, "let's work together to ensure in building your own solution you don't breach SJ's intellectual property rights or misuse our confidential information."

287.    TrueBlue rejected Leslie's offer for the parties to work together and dismissed Swipejobs' later attempts to ensure that TrueBlue was not breaching the Exchange Agreement while developing its own solution.

288.    TrueBlue's dismissal of Swipejobs' concerns and refusal to work with Swipejobs breached the implied covenant of good faith and fair dealing and frustrated the underlying purpose of the Exchange Agreement.

289.    Only after TrueBlue launched its JobStack 2 solution did Swipejobs learn that TrueBlue breached this implied covenant when it first began the development of JobStack 2 and then repeatedly throughout its development.  During that time, Swipejobs repeatedly relied upon statements made by TrueBlue, including the current CEO, who was previously the head of the PeopleReady business unit.

290.    On information and belief, including due to the iterative process of developing and refining a live transaction platform, TrueBlue is continuing to hide from Swipejobs its efforts to refine the functionality of JobStack 2, thus frustrating the parties' ability to work together to comply with the Exchange Agreement and further breaching the implied covenant.

291.    TrueBlue's breaches have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which it has no adequate remedy at law.

292.    As a direct and proximate result of TrueBlue's breach of the implied covenant, Swipejobs has suffered damages in an amount to be determined at trial.

293.    TrueBlue has been unjustly enriched by its actions.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

COUNT VI: Breach of the Implied Covenant – Seeking the Confidential Information

294.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

295.    The Exchange Agreement was executed for the purpose of providing TrueBlue with a branded version of the Exchange while protecting Swipejobs' proprietary information.

296.    Although Section 9.1 and Exhibit C of the Exchange Agreement indicate that Swipejobs will provide TrueBlue with ████████████████████████████ the Exchange Agreement does not expressly limit when TrueBlue may request information and support from Swipejobs under those provisions.

297.    The implied covenant of good faith and fair dealing fills this gap with an implied obligation for TrueBlue to seek technical information about the Exchange and related support services from Swipejobs only when it is reasonably necessary for TrueBlue's use of the Exchange, consistent with the purpose of the Exchange Agreement.  This implied covenant is supported by the recitals and Sections 2.3 and 5.2 of the Exchange Agreement.

298.    On information and belief, TrueBlue acted in bad faith by requesting technical information about the Exchange, including one-pagers, product demonstrations, and consulting efforts under the guise of understanding the Exchange functionality so that TrueBlue could continue its partnership with Swipejobs, when in reality, TrueBlue was seeking Swipejobs' Confidential Information to support TrueBlue's development of its own solution.

299.    TrueBlue's requests for technical support from Swipejobs for improper purposes led to a waste of Swipejobs' resources.

300.    TrueBlue's breaches have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which it has no adequate remedy at law.

301.    As a direct and proximate result of TrueBlue's breach of the implied covenant, Swipejobs has suffered damages in an amount to be determined at trial.

302.    TrueBlue has been unjustly enriched by its actions.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

**COUNT VII: Trade Secret Misappropriation (18 U.S.C. § 1836) – Improper Solution**

303.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

304.    The SJ Trade Secrets consist of the Service Desktop, the Priority Actions Trade Secret, the Customer Invitation Trade Secret, the Matching Information on Service Desktop Trade Secret, the Conditional Dispatch Trade Secret, the Rates Engine Trade Secret, and the Reliability Service Trade Secret.

305.    Swipejobs has spent considerable time, effort, and expense in developing the SJ Trade Secrets.

306.    The SJ Trade Secrets are integral to the function of the Swipejobs Exchange, which is used in interstate commerce to facilitate the staffing of jobs nationwide.

307.    Swipejobs has undertaken reasonable methods to maintain the secrecy of the SJ Trade Secrets, including entering into confidentiality or non-disclosure agreements with any third party with whom it shared the information.

308.    The SJ Trade Secrets are not generally known to individuals or entities outside of Swipejobs and its partners using the Exchange and their employees who have committed to maintaining the secrecy of such information.

309.    The Exchange Agreement includes strict confidentiality provisions that require TrueBlue to maintain the confidentiality of SJ's Confidential Information, including the SJ Trade Secrets.

310.    The SJ Trade Secrets derive independent economic value from not being generally known to or reasonably ascertainable by another person who could obtain such economic value from its disclosure or use.

311.    Swipejobs' Exchange is the only digital staffing solution on the market that incorporates the features enabled by the SJ Trade Secrets in the way it facilitates real-time interactions between customers and associates.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

312.    Throughout its work with Swipejobs, TrueBlue was given access to, and acquired knowledge of, the SJ Trade Secrets for the exclusive purpose of collaborating with Swipejobs to integrate the Swipejobs Exchange into TrueBlue's business and to maintain and improve TrueBlue's use of the Swipejobs Exchange.  Swipejobs shared the SJ Trade Secrets with TrueBlue pursuant to the protections provided in the confidentiality provisions of the Exchange Agreement.

313.    TrueBlue had, and continues to have, an express duty to maintain the secrecy of the SJ Trade Secrets and to limit its use of the SJ Trade Secrets.  It also knew, or had reason to know, that Swipejobs intended and expected that the secrecy of its trade secrets would be maintained and strictly observed.

314.    TrueBlue has exploited and misappropriated the SJ Trade Secrets by using the SJ Trade Secrets to develop its own staffing solution.  This was done without Swipejobs' express or implicit consent, and in violation of TrueBlue's contractual obligation to maintain the secrecy of Swipejobs' Confidential Information.

315.    TrueBlue's unauthorized use of the SJ Trade Secrets for the improper use of developing its own solution was purposely hidden from Swipejobs for years and until TrueBlue launched its competitive solution publicly.

316.    TrueBlue intentionally concealed the fact that it was using the SJ Trade Secrets to develop its own solution, including by reassuring Swipejobs that TrueBlue had engaged outside counsel to "ensure a careful and conservative approach to development" that would not incorporate "the intellectual property of swipejobs."

317.    While TrueBlue was already secretly using the SJ Trade Secrets to reverse engineer and duplicate the Swipejobs Exchange features, TrueBlue's CEO misled Swipejobs to believe that the TrueBlue team building the new solution was a separate product team from the team that was working with Swipejobs to implement the Swipejobs Exchange at TrueBlue, when in reality there was significant overlap between the individuals on both teams. TrueBlue's CEO also claimed on multiple occasions to Swipejobs that she had no confidence in TrueBlue's ability

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

to build its own solution and that her goal was to extend the Exchange Agreement and partnership between Swipejobs and TrueBlue.

318.    As a result, Swipejobs invested significant time and resources into conducting product demonstrations, information sharing, and other consulting efforts for TrueBlue, vastly expanding the amount and detail of the SJ's Trade Secrets shared with TrueBlue.

319.    TrueBlue acquired knowledge of the SJ Trade Secrets through improper means. On information and belief, when TrueBlue requested details about the SJ Trade Secrets from Swipejobs, it misrepresented to Swipejobs that such information would be used by TrueBlue to determine whether to turn on additional features in its use of the Exchange or to continue using the Exchange, when TrueBlue was in fact seeking more trade secret information from Swipejobs to use in its development of JobStack 2.

320.    Swipejobs' review of TrueBlue's platform revealed that TrueBlue stole most unique features of the Swipejobs Exchange that Swipejobs shared with TrueBlue for the sole purpose of supporting TrueBlue's use of the Exchange.  TrueBlue bypassed the years of hard work, cost, and risk necessary to develop and refine those proprietary features.

321.    Swipejobs provided TrueBlue with actual notice that TrueBlue's current and prior activities constitute misappropriation of Swipejobs' trade secrets at least as early as October 2024.

322.    With this knowledge, TrueBlue has not stopped using Swipejobs' trade secret information in its own JobStack 2 solution.  On information and belief, TrueBlue has continued to exploit the SJ Trade Secrets and launch JobStack 2 in additional TrueBlue branches, knowing that JobStack 2 was developed using improper means.

323.    TrueBlue's misappropriation of the SJ Trade Secrets was and continues to be willful and malicious.

324.    As a result of TrueBlue's violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, Swipejobs has suffered, and will continue to suffer, irreparable harm in having its trade secret information made available in TrueBlue's directly competitive JobStack 2

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

solution, including the diminution of value of its trade secrets, diminution of Swipejobs' business value, and unfair diminution of its competitive advantage.

325.    Swipejobs has been damaged as a result of TrueBlue's conduct and is entitled to damages for the actual loss caused by TrueBlue in an amount to be proven at trial, any unjust enrichment not encompassed in the computation of Swipejobs' losses, exemplary damages for willful and malicious misappropriation, injunctive relief, and an award of attorneys' fees. Alternatively, in lieu of damages for actual loss or unjust enrichment, Swipejobs is entitled to a reasonable royalty for TrueBlue's unauthorized disclosure and use of the SJ Trade Secrets.

## COUNT VIII: Trade Secret Misappropriation
## (18 U.S.C. § 1836) – Improper Patent Applications

326.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

327.    TrueBlue has exploited and misappropriated the Conditional Dispatch and Rates Engine Trade Secrets by using this trade secret information to file its own patent applications and claiming Swipejobs' innovations as its own, including, but not limited to, in its filings of the '163 Patent and '126 Patent, and the '539 Application and '518 Application.  TrueBlue further misappropriated the SJ Trade Secrets by disclosing them to the public in TrueBlue's published patent filings, including at least the '163, '126, '504, and '881 Patents and the '518, '539, '376, and '756 Applications.  This was done without Swipejobs' express or implicit consent, and in violation of TrueBlue's contractual obligation to maintain the secrecy of Swipejobs' Confidential Information.

328.    TrueBlue's unauthorized use of the Conditional Dispatch and Rates Engine Trade Secrets for the improper use of filing its own patent applications was purposely hidden from Swipejobs until after TrueBlue informed Swipejobs of two TrueBlue patents on or about February 2025.

329.    TrueBlue intentionally concealed the fact that it was using the Conditional Dispatch and Rates Engine Trade Secrets to file its own patent applications, including by

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

reassuring Swipejobs that TrueBlue had engaged outside counsel to "ensure a careful and conservative approach to development" that would not incorporate "the intellectual property of swipejobs."

330.    Because TrueBlue expressly agreed that Swipejobs owns all Exchange functionality and features developed based on "Feedback" (including comments, suggestions, and other feedback provided by TrueBlue to Swipejobs related to any of Swipejobs' products or services), there was no reason for Swipejobs to search for TrueBlue's patent filings—which were just a few out of thousands of patent filings published by the USPTO each year.  Swipejobs reasonably relied on Sections 4.1, 5.2, and 6.2, and that TrueBlue would act in good faith under the Exchange Agreement, and had no reason to suspect that TrueBlue would use Swipejobs' Confidential Information or trade secrets in its patent filings or claim to own intellectual property rights or features that are expressly granted to Swipejobs.

331.    While Swipejobs had no reason to check TrueBlue's patent filings, TrueBlue also intentionally concealed its improper patent filings by requesting non-publication of Application No. 17/159,015 (now the '881 Patent).

332.    Swipejobs' review of TrueBlue's patent filings revealed that TrueBlue stole many unique features of the Swipejobs Exchange that Swipejobs shared with TrueBlue for the sole purpose of supporting TrueBlue's use of the Exchange.

333.    TrueBlue's misappropriation of the SJ Trade Secrets was and continues to be willful and malicious.

334.    As a result of TrueBlue's violations of the DTSA, 18 U.S.C. § 1836 *et seq.*, Swipejobs has suffered, and will continue to suffer, irreparable harm in having its trade secret information publicly disclosed in TrueBlue's patent filings, thus purporting to give TrueBlue ownership of technology that belongs wholly to Swipejobs, including the diminution of value of its trade secrets, diminution of Swipejobs' business value, and unfair diminution of its competitive advantage.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

335.     Swipejobs has been damaged as a result of TrueBlue's conduct and is entitled to damages for the actual loss caused by TrueBlue in an amount to be proven at trial, any unjust enrichment not encompassed in the computation of Swipejobs' losses, exemplary damages for willful and malicious misappropriation, injunctive relief, and an award of attorneys' fees. Alternatively, in lieu of damages for actual loss or unjust enrichment, Swipejobs is entitled to a reasonable royalty for TrueBlue's unauthorized disclosure and use of the SJ Trade Secrets.

**COUNT IX: Trade Secret Misappropriation (R.C.W. § 19.108.010) – Improper Solution**

336.     Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

337.     Swipejobs owns and takes reasonable measures to keep secret the SJ Trade Secrets, which derive independent economic value from not being generally known to or reasonably ascertainable by another person who could obtain such economic value from its disclosure or use, as alleged above.

338.     Since 2015, TrueBlue has had, and continues to have, an express duty to maintain the secrecy of the SJ Trade Secrets and to limit use of the SJ Trade Secrets.

339.     Throughout its partnership with TrueBlue, Swipejobs has given TrueBlue access to the SJ Trade Secrets, including access to the Service Desktop, for the exclusive purpose of furthering TrueBlue's use of the Exchange in accordance with the Exchange Agreement.  Every communication of the SJ Trade Secrets from Swipejobs to TrueBlue has occurred pursuant to the protections provided in the confidentiality provisions of the Exchange Agreement.  At all times TrueBlue knew, or had reason to know, that Swipejobs intended and expected that the secrecy of its trade secrets would be maintained and strictly observed.

340.     TrueBlue misappropriated Swipejobs' trade secrets by improperly using the SJ Trade Secrets to develop its own mobile staffing solution with the same proprietary functionality as the Swipejobs Exchange.  This was done without Swipejobs' express or implicit consent, and in violation of TrueBlue's contractual obligation to maintain the secrecy of Swipejobs' Confidential Information.

**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

341.    TrueBlue's misappropriation of the SJ Trade Secrets was and continues to be willful and malicious.

342.    Swipejobs has been damaged as a result of TrueBlue's conduct and is entitled to damages for the actual loss caused by TrueBlue in an amount to be proven at trial, any unjust enrichment not encompassed in the computation of Swipejobs' losses, exemplary damages for willful and malicious misappropriation, injunctive relief, and an award of attorneys' fees pursuant to R.C.W. § 19.108.030-40.

## COUNT X: Trade Secret Misappropriation

## (R.C.W. § 19.108.010) – Improper Patent Applications

343.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

344.    TrueBlue misappropriated Swipejobs' Conditional Dispatch and Rates Engine Trade Secrets by improperly using them to file its own patent applications and claiming Swipejobs' innovations as its own, including, but not limited to, in its filings of the '163 Patent and '126 Patent, and the '539 Application and '518 Application.  TrueBlue further misappropriated the Conditional Dispatch and Rates Engine Trade Secrets by disclosing them to the public in TrueBlue's published patent filings, including at least the '163, '126, '504, and '881 Patents, and the '518, '756, '376, and '539 Applications.  This was done without Swipejobs' express or implicit consent, and in violation of TrueBlue's contractual obligation to maintain the secrecy of Swipejobs' Confidential Information.

345.    TrueBlue's misappropriation of the Conditional Dispatch and Rates Engine Trade Secrets was and continues to be willful and malicious.

346.    Swipejobs has been damaged as a result of TrueBlue's conduct and is entitled to damages for the actual loss caused by TrueBlue in an amount to be proven at trial, any unjust enrichment not encompassed in the computation of Swipejobs' losses, exemplary damages for willful and malicious misappropriation, injunctive relief, and an award of attorneys' fees pursuant to R.C.W. § 19.108.030-40.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1    **COUNT XI: Declaratory Judgment for Patent and Solution Ownership**

2    347.    Swipejobs incorporates by reference the allegations in the preceding paragraphs

3    as though fully set forth herein.

4    348.    Pursuant to 28 U.S.C. § 2201(a), the Court may declare the rights, status, or legal

5    relations of interested parties to a contract when a controversy exists between the parties

6    regarding the contract.

7    349.    As detailed herein, an actual case or controversy exists between the parties as to

8    Swipejobs' rights, title, and interest in TrueBlue's patents and patent applications, as well as in

9    JobStack 2, which is comprised of intellectual property, features, and functions of the Exchange

10   belonging solely to Swipejobs.

11   350.    TrueBlue ███████████████████████████████████████████

12   ████████████████ the Exchange Feedback Features.  Exchange Agreement, § 6.2.

13   351.    TrueBlue also agreed that ████████████████████████████

14   ██████████████████████████████████████████████

15   ████████████████████████████

16   352.    The language of the Exchange Agreement effected an automatic assignment to

17   Swipejobs of each of TrueBlue's patents related to the Exchange Feedback Features and to "the

18   Exchange and Exchange Software, and all improvements, enhancements, or modifications

19   thereto."

20   353.    Each of TrueBlue's patents and patent applications, including at least the '178,

21   '881, '504, '163, and '126 Patents, and the '942, '708, '539, '518, '376, and '756 Applications,

22   incorporate Exchange Feedback Features and/or are related to "the Exchange and Exchange

23   Software, and all improvements, enhancements, or modifications thereto," and is therefore

24   covered by the scope of the Exchange Agreement's assignment provision.

25   354.    TrueBlue was not permitted to file patent applications incorporating or relating to

26   Exchange Feedback Features because the legal title to those inventions was already owned by

27

**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Swipejobs. Accordingly, the current assignment of the '178, '881, '504, '163, and '126 Patents and the '942, '708, '539, '518, '376, and '756 Applications to TrueBlue is null and void.

355.    Section 6.2 of the Exchange Agreement expressly grants ██████████
███████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████
██████████████

356.    TrueBlue's JobStack 2 solution copies the functionality and features of the Exchange and enhancements thereto, embodies Swipejobs' know-how, and therefore belongs to Swipejobs under the terms of the Exchange Agreement.

357.    Swipejobs is entitled to a declaratory judgment that it is the sole owner of TrueBlue's '178, '881, '504, '163, and '126 Patents, patent applications, and the JobStack 2 solution.

## COUNT XII: Correction of Inventorship

358.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

359.    TrueBlue's patents, including the '178, '504, '163, '881, and '126 Patents claim Swipejobs' innovations.

360.    TrueBlue's patents do not name any of Swipejobs' inventors as co-inventors, despite that TrueBlue's patents claim Swipejobs' innovations, like SJ's Confidential Information, that originated from Swipejobs' inventors.

361.    In most instances, Swipejobs' inventors, including Katrina Leslie, disclosed Swipejobs' innovations to TrueBlue pursuant to the protections provided in the confidentiality provisions of the Exchange Agreement.

362.    In other instances, TrueBlue stole Swipejobs' innovations from Swipejobs' Patent Filings.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

363.    SJ's innovations were improperly claimed by TrueBlue's employees alone and assigned solely to TrueBlue.

364.    Under 35 U.S.C. § 256, Swipejobs is entitled to a correction of inventorship to add Swipejobs' inventors as inventors on the relevant patents to reflect Swipejobs' inventorship rights in the subject matter of those patents.

## COUNT XIII: Conversion

365.    Swipejobs incorporates by reference the allegations in the preceding paragraphs as though fully set forth herein.

366.    Swipejobs has a property interest in its Proprietary Information, which includes but is not limited to its intangible assets, ideas, know-how, and its Confidential Information as defined in the Exchange Agreement.

367.    TrueBlue unjustifiably and willfully interfered with SJ's right to possess, including its right to exclusively possess, SJ's Proprietary Information, including by filing applications for patents based on, relating to, containing, and claiming SJ's Proprietary Information.

368.    TrueBlue's filing of patent applications and receipt of granted patents, including the '178, '881, '504, '163, and '126 Patents, and the '942, '708, '539, '518, '376, and '756 Applications, exceed its extremely limited rights to SJ's Proprietary Information under the Exchange Agreement.

369.    TrueBlue's granted patents relating to SJ's Proprietary Information exclude Swipejobs from "mak[ing], us[ing], offer[ing] to sell, or sell[ing]" the inventions claimed by those patents, thereby depriving Swipejobs of its right to possess and use its Proprietary Information.

370.    TrueBlue's granted patents and published patent applications relating to SJ's Proprietary Information also disclose that Proprietary Information to the public, thereby depriving Swipejobs of its right to exclusively possess otherwise confidential information.

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

371.    TrueBlue's actions have caused and will continue to cause Swipejobs substantial injury, including that which is irreparable and for which Swipejobs has no adequate remedy at law.

372.    As a direct and proximate result of TrueBlue's conversion of Swipejobs' Proprietary Information, Swipejobs has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

Swipejobs respectfully requests that the Court grant Swipejobs the following relief:

a.    A judgment in favor of Swipejobs that TrueBlue has breached its contractual obligations to Swipejobs under Section 2.3 of the Exchange Agreement;

b.    A judgment in favor of Swipejobs that TrueBlue has breached its contractual obligations to Swipejobs under Section 5.2 of the Exchange Agreement;

c.    A judgment in favor of Swipejobs that TrueBlue has breached its contractual obligations to Swipejobs under Section 6.2 of the Exchange Agreement;

d.    A judgment in favor of Swipejobs that TrueBlue has breached its contractual obligations to Swipejobs under the covenant of good faith and fair dealing implied in the Exchange Agreement;

e.    A judgment in favor of Swipejobs that TrueBlue has willfully and maliciously misappropriated Swipejobs' trade secrets in connection with the development and use of its JobStack 2 solution in violation of the Defend Trade Secrets Act;

f.    A judgment in favor of Swipejobs that TrueBlue has willfully and maliciously misappropriated Swipejobs' trade secrets in connection with the improper filing of patent applications that disclose and incorporate Swipejobs' Rates Engine and Conditional Dispatch Trade Secrets in violation of the Defend Trade Secrets Act;

g.    A judgment in favor of Swipejobs that TrueBlue has willfully and maliciously misappropriated Swipejobs' trade secrets in connection with the development and use of its JobStack 2 solution in violation of the Washington Uniform Trade Secrets Act;

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

h.      A judgment in favor of Swipejobs that TrueBlue has willfully and maliciously misappropriated Swipejobs' trade secrets in connection with the improper filing of patent applications that disclose and incorporate Swipejobs' Rates Engine and Conditional Dispatch Trade Secrets in violation of the Washington Uniform Trade Secrets Act;

i.      A declaratory judgment that Swipejobs is the sole owner of all rights, title, and interest in the inventions claimed in the '178, '881, '504, '163, and '126 Patents and the '942, '708, '539, '518, '376, and '756 Applications and embodied in the Exchange Feedback Features and/or the Exchange and Exchange Software, and all improvements, enhancements or modifications thereto, as defined in the Exchange Agreement;

j.      During the pendency of this action, a preliminary injunction ordering TrueBlue to take all steps necessary to prevent further publication in any patent filings of any SJ Trade Secrets, SJ Confidential Information, or Exchange Feedback Features;

k.      A permanent mandatory injunction for specific performance requiring TrueBlue to take all steps necessary to assign and transfer to Swipejobs ownership of all patent applications and issued patents that were filed using, or that disclose, any of the SJ Trade Secrets, SJ Confidential Information, or Exchange Feedback Features, and all applications claiming priority thereto, including at least the '178, '881, '504, '163, and '126 Patents and the '942, '708, '539, '518, '376, and '756 Applications;

l.      An order requiring TrueBlue to file with the U.S. Patent and Trademark Office a request to correct the named inventors of the '178, '881, '504, '163, and '126 Patents;

m.      A constructive trust in the name of Swipejobs for all patent applications filed and patents issued from use of Swipejobs' Proprietary Information;

n.      A judgment in favor of Swipejobs that TrueBlue has committed conversion of Swipejobs' Proprietary Information;

o.      During the pendency of this action, a preliminary injunction ordering TrueBlue and its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

those acting on behalf of or in concert to cease directly or indirectly misappropriating and utilizing the SJ Trade Secrets;

       p.     A permanent injunction ordering TrueBlue and its affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all those acting on behalf of or in concert to cease directly or indirectly misappropriating and utilizing the SJ Trade Secrets;

       q.     In the alternative, in the event that the Court finds exceptional circumstances that render an injunction inequitable, an order that conditions future use of the SJ Trade Secrets upon payment of a reasonable royalty to Swipejobs;

       r.     An order requiring TrueBlue to pay Swipejobs its damages, costs, expenses, and pre-judgment and post-judgment interest for TrueBlue's improper acts;

       s.     An order requiring TrueBlue to disgorge any and all unjust enrichment resulting from TrueBlue's improper acts;

       t.     An order requiring TrueBlue to pay Swipejobs exemplary double damages as authorized by law;

       u.     An order requiring TrueBlue to pay Swipejobs its attorneys' fees as authorized by law;

       v.     Any and all other relief as the Court may deem appropriate and just under the circumstances.

## JURY TRIAL DEMANDED

       Swipejobs hereby demands a trial by jury.

//

//

//

//

//

//

//

COMPLAINT - 69

NO. 2:25-cv-01545

FENNEMORE CRAIG, P.C.
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

DATED:  August 13, 2025.

FENNEMORE CRAIG, P.C.


By    *s/James P. Savitt*

     *s/Brandi B. Balanda*
James P. Savitt, WSBA #16847
Brandi B. Balanda, WSBA #48836
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
Telephone:  206.749.0500
Facsimile:   206.749.0600
Email:  jsavitt@fennemorelaw.com
Email:  bbalanda@fennemorelaw.com

FISH & RICHARDSON P.C.

John S. Goetz (*pro hac vice* application forthcoming)
Vivian Cheng (*pro hac vice* application forthcoming)
7 Times Square, Floor 20
New York, NY 10036
Telephone: 212-765-5070
Facsimile: 212-258-2291
Email:  goetz@fr.com
Email:  cheng@fr.com

*Attorneys for Plaintiff Swipejobs Inc.*